866 A.2d 1053

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. H.B. AND L.M.B., DEFENDANTS–RESPONDENTS.

IN THE MATTER OF C.B., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued January 4, 2005—Decided February 16, 2005.

150

Before Judges LEFELT, FUENTES and FALCONE.

*Diane Breese,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Breese,* on the brief).

*John M. Zaiter* argued the cause for respondent L.M.B. (*Broscious and Fisher,* attorneys; *Mr. Zaiter,* on the brief).

*Marcia S. Birnbaum,* Assistant Deputy Public Defender, argued the cause for C.B. (*Yvonne Smith Segars,* Public Defender; *Ms. Birnbaum,* on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

In this appeal, we hold that certain evidentiary rulings and factual findings made by the Family Part used to uphold its decision to dismiss this child sexual abuse case were erroneous and not based on competent evidence. The court's final determi-

nation was thus legally insupportable, requiring that the matter be remanded for a new fact-finding hearing.

We also hold that in adopting Megan's Law, *N.J.S.A.* 2C:7–1 to –19, and the child protection laws embodied in Title 9, the Legislature envisioned, as a matter of public policy, a comprehensive level of cooperation between county prosecutors, the unit of government primarily responsible for the enforcement of our State's criminal laws, and the Division of Youth and Family Services (DYFS), the state agency responsible for the protection of our State's children. This public policy was needlessly undermined here.

■ Finally, we hold that when an investigation concerning allegations of abuse and neglect of a child requires the removal and separation of a central family member, DYFS has a special duty to closely monitor the case and keep abreast of any development that might call into question the continued need for the separation. This heightened sensitivity was conspicuously absent here.

I

DYFS appeals from the final judgment of the Chancery Division Family Part dismissing its abuse and neglect complaint, filed pursuant to the provisions of Title 9, against defendant L.M.B. ("Linda"), the mother of a thirteen-year-old girl whom we will refer to as Cathy.[1] In its complaint, DYFS alleged that Linda exposed her daughter to the risk of emotional and physical harm by permitting her husband ("Lawrence"[2]), Cathy's stepfather, to

---

[1] The names "Cathy" and "Linda" are fictitious appellations used here to protect the anonymity of the individuals involved. Ordinarily, we would not refer to an adult by using his or her first name, even a fictitious one. The reference to L.M.B. as "Linda" is used here only for purposes of clarity. No disrespect is intended.

[2] The name "Lawrence" is fictitious. *See supra,* note 1 for further clarification.

reside in the home after learning that the child had accused him of sexually molesting her over an eighteen-month period.

The Family Part conducted a fact-finding hearing, as defined in *N.J.S.A.* 9:6–8.44, to determine whether Cathy had been abused or neglected by her mother's actions. A number of witnesses testified, including two physicians and two risk assessment specialists. Linda testified that Cathy had recanted and claimed to have fabricated the allegations of molestation against her stepfather in retaliation for his failure to timely complete household renovations and as a misguided attempt to force him to participate in anger management counseling.

The hearing judge issued a letter-opinion finding that DYFS had not presented sufficient credible evidence to corroborate the child's initial allegations of sexual abuse. Without corroboration, a complaint based only on the child's allegations is unsustainable as a matter of law. *N.J.S.A.* 9:6–8.46a. The judge further stated, however, that even "assuming that there was evidence of corroboration," DYFS had failed to show that the child had been abused or neglected by the mother's unilateral decision to permit the stepfather to return to live with her daughter.

DYFS now argues that the Family Part committed reversible error by: (1) declining to order the county prosecutor to turn over the Megan's Law file containing information supporting the classification of the stepfather as a sex offender; (2) rejecting the application of the Law Guardian requesting the court to interview the child *in camera* and outside the presence of her mother and counsel; (3) refusing to admit into evidence statements made by the stepfather and Cathy's friend "Teresa," [3] or alternatively, allowing the use of these statements for the limited purpose of impeaching Linda's credibility; (4) failing to treat the testimony of the physician who examined Cathy at DYFS's request as evidence corroborating the initial allegations of sexual abuse; and (5) failing to properly consider the testimony of the risk assessment special-

[3] The name "Teresa" is fictitious.

ist as bearing on the question of Linda's ability or willingness to protect Cathy from her stepfather. Although not directly raised before the Family Part, DYFS also argues that the hearing judge erred when she failed to apply the provisions of *N.J.S.A.* 9:2–4.1b in determining whether the stepfather's return to the marital home was in the child's best interest.

Both Linda and the Law Guardian, acting on Cathy's behalf, argue that the Family Part correctly concluded that DYFS had failed to present sufficient evidence corroborating the allegations of sexual abuse. They also argue that Linda's decision to permit her husband to return to live with her daughter was proper and justified by the child's repeated recantations and by DYFS's refusal to respond to Linda's requests to re-interview her daughter.

After analyzing the record, we hold that the Family Part erred: (1) when it declined to direct the Warren County Prosecutor's Office to release the stepfather's Megan's Law file to the Deputy Attorney General (DAG) prosecuting the abuse and neglect case; (2) when it denied the Law Guardian's application for the court to interview the child *in camera;* and (3) when it found that the child's alleged recantation was sufficiently reliable to justify defendant's unilateral decision to permit the stepfather to cohabitate with his alleged victim. We thus reverse the order dismissing the Title 9 action and remand the matter for further proceedings.

## II

### *The Investigation*

Cathy was born on November 8, 1989. She was thirteen years old at the commencement of this case. Linda divorced Cathy's father in March 1992, the same year she began dating Lawrence. Linda and Lawrence moved in together in 1996 and were married in June 1997. Cathy and Linda's mother complete the household. Cathy's bedroom is on the first floor of the house, near the only

bathroom and near her grandmother's room. The bedroom shared by her mother and stepfather is on the second floor.

On May 30, 2003, while on an overnight visit, Cathy told her friend Teresa that she was being sexually molested by her stepfather. Teresa's mother overheard the girls' conversation and immediately contacted the local police department. Without her mother's knowledge, Cathy was taken to the Alpha Borough police station that same night where she was interviewed by investigators from the Warren County Prosecutor's Office.

Cathy gave a recorded statement under oath, in which she related a detailed description of the sexual abuse allegedly suffered at the hands of her stepfather. The statement consisted of questions posed to Cathy by a prosecutor's investigator and her answers. Also present during the questioning were a police officer from Alpha Borough and another prosecutor's investigator.

According to Cathy, Lawrence had been molesting her for over one and a half years. The first incident occurred around August 2001. He started entering her bedroom at approximately three or four o'clock in the morning and using both his hands to sexually touch her under her clothes. This occurred "every other day and then it got to every day of the week," with the most recent incident occurring just one week prior to the date of her statement.

Cathy stated that, with few exceptions, the abuse always occurred in her bedroom. She gave the following description of how the abuse would usually occur:

[INVESTIGATOR]: Okay, when he comes into your room, you say usually between 3:00 and 4:00 a.m., before he leaves for work?

[CATHY]: M-hm.

[INVESTIGATOR]: Is he dressed for work or is he dressed in his pajamas or . . .

[CATHY]: No, he's dressed for work.

[INVESTIGATOR]: Oh, he's already dressed for work . . .

[CATHY]: M-hm.

[INVESTIGATOR]: In his work clothes.

[CATHY]: Yeah.

[INVESTIGTOR]: Okay, and you have your own bedroom on the first floor.
[CATHY]: Yeah.
[INVESTIGATOR]: And it's next to your grandmother's ... bedroom?
[CATHY]: M-hm.
[INVESTIGATOR]: Has your grandmother ever said anything or heard anything?
[CATHY]: No, no, she just doesn't like him.
[INVESTIGATOR]: But she's never heard this go on or ...
[CATHY]: No.

The first incident she described involved waking up to find her stepfather "going up [her] shirt and down [her] pants" and squeezing her breasts. She stated that she tried to push him away and said "stop, please stop." He would also touch and hold her vagina underneath her clothes. She described another incident "about a half year ago, [or] a couple of months ago," saying that "[a]ll he did was just reach down, uh, my pants and he just stuck his finger up my vagina," and she told him to please stop because it hurt. Following that incident, the frequency of abuse decreased to every other day of the week.

She described another incident that occurred about six months prior to the date of her statement. She was awakened by her stepfather grabbing her breasts, then unzipping his "pants and [making her] hold [his penis] and ... tug on it." She told him "please stop, stop, and then he stopped." Cathy also alleged that one afternoon, a week prior to May 30, 2003, Lawrence reached up her shirt to touch her breast while they were in the living room and her mother was in the kitchen. She was able to stop him by kicking him in the leg.

On approximately five separate occasions during the afternoon, Lawrence "would get ads ... Playboy stuff where he saw naked girls ... on the internet." He would call her into the room to say "perverted things like ... oh she needs to wax and ... she has a big bush." Lawrence also told her that she would lose her virginity before getting engaged. She was uncertain what he meant by these comments. Although he never threatened her, Lawrence asked her whether she told anyone about his conduct. He also told her that he hoped she would not.

Twelve-year-old Teresa, whom Cathy referred to as her "best friend," also gave a taped statement to police investigators. She said that Cathy had told her about Lawrence's molestation and that she feared he would rape her. Teresa provided similar details of the abuse.

That same night, Lawrence was brought to the Alpha Borough Police Department and was questioned by investigators from the prosecutor's office. After he was read his rights under *Miranda*,[4] he gave a taped statement, under oath, denying Cathy's allegations of abuse. He indicated that, as the first person to get up in the morning, he would customarily go downstairs to use the bathroom and begin preparing the morning coffee. He would then go back upstairs, get dressed, say goodbye to his wife, return downstairs and go into Cathy's bedroom to kiss her goodbye before leaving for work.

The investigator then asked Lawrence the following questions:

[INVESTIGATOR]: Okay. Now when you go in and you kiss your daughter goodbye, do you ever touch her while you're in there?

[LAWRENCE]: No, I don't touch her. If the blanket's down, I pull it up over top of her.

[INVESTIGATOR]: Okay. Has there ever been a time where she could've perceived that you were attempting to touch her breasts or her vagina?

[LAWRENCE]: Never her vagina. Maybe when I pulled the cover up, she could perceive that . . .

[INVESTIGATOR]: Okay. Has that ever actually occurred?

[LAWRENCE]: No.

Lawrence also indicated that he has, on occasion, entered the bathroom while Cathy is in the shower, but that he never looked at her. However, when asked whether Cathy ever discussed with him that she felt he had touched her inappropriately, he replied:

Yes, she said once that, uh, my wife was sitting next to me on the couch, and, uh, she had come across, um, her front side down on me on my, over my lap and stuff and she had said about me touching her breasts, and I said no, I didn't, and my wife, who was right there, said no, she didn't, or no, I didn't either.

---

4 *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L. Ed.*2d 694 (1966).

Finally, when asked whether he knew of any reason why Cathy would wrongly accuse him of having molested her, Lawrence indicated "no." He said his relationship with his stepdaughter had not changed and that there were no problems between the two of them.

## III

### *DYFS Involvement*

After interviewing the children, the investigators notified DYFS, which in turn dispatched a Special Response Unit (DYFS/SPRU) to the police station where Cathy had been interviewed. The "Documentation of Response" report filed reflects that Cathy reiterated the allegations of abuse to a DYFS/SPRU representative, including Lawrence's alleged admonition not to tell anyone about what he had done. According to the DYFS/SPRU report, Cathy understood Lawrence's words as a "threat to herself or her mom, hence she had not told her mother."

At around 1:40 a.m., the prosecutor's investigators requested the Division's representative to return Cathy to Teresa's house. According to the DYFS/SPRU report, Linda agreed to have Cathy remain at Teresa's house while she (Linda) waited for Lawrence to complete his interview with the prosecutor's investigators. The report noted that the DYFS/SPRU representative "advised mom of the need to keep [the] child away from the stepfather, if he is released after the interview." Linda was also told that a DYFS representative would be contacting her on Monday, June 2, 2003, for a follow up visit.

On Saturday, May 31, 2003, at around 6:00 a.m., a DYFS/SPRU representative spoke to Linda via telephone and informed her that Teresa's mother would pick up Cathy's clothes and school related possessions. Once again, according to the DYFS/SPRU report, Linda informed the Division that Lawrence had agreed to leave the house to enable Cathy to return home on Monday. Under the

heading of "Summary of Conclusions/Assessment," the DYFS/ SPRU report concludes with the following statement:

> This is an incident of alleged sexual abuse. At this time, there is no conclusive information to assess the validity of the allegation, but safety of child [Cathy] was assured by mom making plans for child to be removed from the location of the residence of the alleged perp, pending further investigative process, by the prosecutors, and DYFS.

According to entries made in a DYFS Referral Response Report, DYFS's next contact with Cathy was on Monday, June 2, 2003. Division caseworker Kevin Riehl visited Cathy at her school and explained that he wanted to speak to her about the allegations of sexual molestation she had made against her stepfather: "I asked her how she was doing and she said 'not too good lately.' I asked her to explain what she meant and she said 'my stepfather has been touching me a lot.' " Cathy then described to Riehl the same graphic and disturbing details of abuse she had described two days before in her statement to the prosecutor's investigators.

Riehl also asked Cathy whether she had discussed her situation with her mother: "I asked [her] if she thought that her mother was aware of any of this and she said 'No.' . . . She said that her mother had become very upset in the past when [Lawrence] threatened to leave her. She didn't want to put her mother through this again." Cathy also told Riehl that she was afraid of Lawrence.

Later that afternoon, Riehl went to Linda's house to discuss with her the details of Cathy's statement. Although no one was home when he arrived, he was soon joined by Cathy's grandmother who denied any knowledge of the abuse. At her suggestion, Riehl telephoned Linda at her work and they agreed to meet. When he arrived at her work place, Linda apologized and told him that attorney Scott Wilhelm had advised her not to speak with him at this time.

On June 5, 2003, Riehl telephoned Linda to schedule another meeting. According to Riehl, she once again declined to meet with him and told him that she had an appointment with attorney Robert Paterson on June 9, 2003. Riehl emphasized to Linda the

importance of meeting as soon as possible and told her to contact him immediately after her meeting with Paterson. Later that same day, Riehl telephoned Lawrence, who also declined to speak to him on the advice of attorney Scott Wilhelm.

The next documented contact between DYFS and Linda occurred on June 25, 2003, when Riehl met with Linda at her home. Although not physically present, Linda's attorney Robert Paterson "was on the phone via teleconference." Riehl reviewed the details of Cathy's allegations with Linda, including how Cathy indicated that Lawrence would come into her bedroom early in the morning before the rest of the family was up and about. Linda disputed this account of the family's early morning activities and appeared incredulous as to Cathy's allegations of abuse. Riehl described her statements as follows:

> I asked her if [Lawrence] was up for a period of time before she woke up and she said "No, I get up early also to get [Cathy] ready for school." [Linda] didn't seem to believe that it was possible for [Lawrence] to do such a thing. She seemed hurt. I asked [Linda] if [Cathy] ever approached her about any concern regarding [Lawrence] and she said no.

Despite these reservations, Linda indicated that she supported her daughter "100 percent." Riehl also wrote that Linda claimed Cathy had told her she misses and loves Lawrence and wanted him to return home. There is no mention or discussion, however, of any recantation by Cathy. In fact, Riehl's notes of the meeting indicate that he requested Linda's consent for Cathy to be examined by a DYFS-selected physician. Although she had "no problem" with the request, Linda wanted to speak to her attorney first before agreeing to any tests. Cathy's medical examination took place on July 23, 2003.

Riehl's final entry on the Referral Response Report was made on November 7, 2003. It documents that the Division had received notice that Lawrence had returned to the home. Riehl immediately responded to the residence to verify the allegation. Linda not only confirmed that Lawrence had resumed living with her and Cathy, but indicated that she made this decision based on

Cathy's alleged recantation and upon the advice of her (Linda's) attorney.

At the fact-finding hearing, Linda testified that Lawrence had moved back into the house on October 15, 2003. She gave the following description of the events that led to her decision to permit Lawrence to resume cohabitating with her daughter:

> after several hundred conversations with my daughter about everything and where [sic] I was totally convinced ... that nothing had happened and she kept asking for him [Lawrence] to come back, what I did was I took the time to talk to my daughter that nobody wanted to do. I wanted to find out the truth. I had the truth. I was totally convinced at that point that nothing happened.

In fact, fearing that Cathy might face some type of legal repercussion for allegedly "lying" to the police, Linda testified that she retained an independent attorney for her daughter "to protect her interests." Thus, in addition to the advice of her own counsel, Linda had the sophistication and intellectual wherewithal to understand and appreciate the potential adverse consequences of Cathy's alleged recantation.

It is undisputed, however, that despite Linda's professed frustration with DYFS's unresponsiveness to her repeated pleas for action, and despite the abundance of legal resources available to her, neither she, her counsel nor Cathy's counsel ever petitioned DYFS in writing for leave to permit Lawrence to return to the marital residence or sought judicial intervention to compel DYFS to act.

## IV

### The Fact–Finding Hearing

At the fact-finding hearing, Linda testified that on June 9, 2003, she overheard a telephone conversation between Cathy and Teresa, in which Cathy allegedly repudiated the accusations she had made against Lawrence. The DAG representing DYFS immediately objected to this testimony on hearsay grounds. In response, Linda's counsel argued that he was not offering this testimony for the truth of the matter asserted, *i.e.,* that Cathy had actually

recanted. Rather, counsel argued that the details of the alleged recantation were admissible to explain Linda's actions in response thereto. The following colloquy between the court and counsel captures what transpired next:

THE COURT: All right. Then it sounds like you are using the statement then . . . for its truth.

[LINDA'S ATTORNEY]: As for her impression of that statement, for how she reacted to the statement,—

THE COURT: Well, then we don't need to hear—

[LINDA'S ATTORNEY]:—not for the truth.

THE COURT: Then we don't need to hear what the statement is. She can just tell us what she did as a result of hearing what [Cathy] said.

[LINDA'S ATTORNEY]: But that wouldn't make any sense, what she did based on what [Cathy] said.

THE COURT: Yeah, sure.

[LINDA'S ATTORNEY]: Well . . . it's undisputed that she recanted her story at some point in time. This was the first indication of that. She then acted—

THE COURT: I know, but you won't need to hear what . . . [Cathy] said.

[LINDA'S ATTORNEY]: Yes.

THE COURT: Okay.

[DAG]: But again, Your Honor, that would be the hearsay objection based on that we're going towards that she recanted, and the truth of the matter is her recantation based on what she said.

[LINDA'S ATTORNEY]: Judge, if I was trying to admit that statement to prove she was not in fact sexually abused, it would be inadmissible, but I'm trying to admit it to show how [Linda] reacted to it, what she did. She contacted D.Y.F.S. immediately. [W]hether or not I believe the statement is not why I'm trying to introduce it at this time,—

THE COURT: Uh-huh.

[LINDA'S ATTORNEY]:—not to mention the transcript of her statement, because it's already in evidence. [T]he statement she made to the prosecutor's office, [Cathy's] statement.

THE COURT: Uh-huh. Okay. So it's being used to show that she made an inconsistent statement?

[LINDA'S ATTORNEY]: Right.

The Court then permitted Linda to testify at length about the details of the alleged recantation. According to Linda, Cathy fabricated the allegations of abuse as a means of forcing Lawrence to seek anger management counseling. She also claimed that Cathy concocted the molestation story to retaliate against Law-

rence for failing to complete household renovations in time to celebrate her birthday.[5] Thus, Linda testified, Cathy felt angry and betrayed when Teresa and her mother reported her "lies" to the police. Linda described her daughter's statements as follows:

> As she just kept crying and saying mommy, I'm sorry, I lied, they made me lie, I was blinded by them, I can't believe I believed them, they told me that the people I was seeing were counselors. My daughter had no idea what a prosecutor was. We never were involved with them. She had no idea. [Teresa's mother] had told her that they were counselors and so did [Teresa].

Linda testified, however, that she never spoke to either Teresa or her mother to confirm her daughter's allegations. On June 9, 2003, the same date of her daughter's recantation, Linda testified that she called DYFS representative Kevin Riehl to report what Cathy had told her. When asked how she remembered the exact date, Linda indicated that she had created and maintained "a whole timeline from the time it started because I realized the seriousness of the allegations, and I wanted to have who I spoke to, what we spoke about, and the dates, just so I could keep everything correct when people spoke to me."

According to Linda, she eventually spoke to Riehl the following day, June 10, 2003, and told him about Cathy's recantation. She claimed that he was not interested in interviewing the child, and was satisfied to proceed with Cathy's original statement. Thereafter, Linda claimed to have spoken on several occasions to Alpha Borough police officer Kevin Hammerstone about Cathy's recantation. She also told her attorney at the time, Robert Paterson.

According to Linda, she eventually met with Riehl on June 23, 2003.[6] Her attorney participated in the meeting via telephone conference. She testified that, at this meeting, she again told Riehl of Cathy's recantation and she and her lawyer requested that DYFS interview the child. According to Linda, Riehl refused

---

[5] Linda also testified, however, that the birthday party took place six months before Cathy first made the allegations of abuse.

[6] As noted earlier, DYFS records indicate that this meeting occurred on June 25, 2003.

to take any action. DYFS's record documenting what transpired at this meeting does not indicate that either Linda or her counsel advised Riehl that Cathy had recanted.

Although Riehl acknowledged speaking to Linda about Cathy's recantation, he could not recall when this occurred or what his response was at the time. He denied saying, however, that he only believed the first version of the story. Once he became aware that Cathy had allegedly lied about being molested by Lawrence, he requested that she be re-interviewed by the prosecutor's investigators outside of Linda's presence. Linda allegedly refused to permit this, prompting DYFS to seek judicial assistance to bring this about. This came to pass on November 17, 2003, when the Family Part ordered that "[Linda] allow [Cathy] to be re-interviewed by the Prosecutor's Office *alone*." (Emphasis added.)

Cathy was re-interviewed by prosecutor's investigators on December 2, 2003. Inexplicably, no record of what Cathy actually said was ever presented to the hearing judge. The only evidence received by the court on this issue was the following testimony by Riehl:

Q. December 2nd of 2003, the Prosecutor's Office re-interviewed [Cathy]. Is that correct?

A. Yes.

Q. Did you bring that transcript of that interview here with you today?

A. I don't have one personally with me, no.

Q. Did you ever inquire as to what [Cathy] told the Prosecutors on December 2nd of 2003?

A. We inquired, yes.

Q. And can you tell me what that was?

A. It was brought to my attention that she did recant her story, but I was still convinced that she was telling the truth the first time.

The court made no attempt to compel production of the transcript of the recantation.

DYFS called Eugene Decker, D.O., as an expert witness. He is a family physician who was qualified to testify as an expert in the field of child sexual abuse. He submitted a report dated Novem-

ber 13, 2003, that memorialized his findings and observations made during a medical evaluation of Cathy conducted on July 23, 2003. Dr. Decker examined Cathy at the request of the Warren County Prosecutor's Office.

In the course of his examination, Dr. Decker detected a tear in Cathy's posterior fourchette, which is vaginal tissue located adjacent to the vulva. He opined that the tear could only have been caused by the insertion of a foreign object into the vaginal region. On cross-examination, he dismissed as "irrelevant" the fact that the examination had occurred two months after the alleged incident of penetration occurred, because trauma, tears and scar tissue can show up months to years after an incident.

Although Dr. Decker never asked Cathy whether the tear may have been self-inflicted, he indicated that it was "highly unlikely" that it was, based on the level of pain associated with a tissue tear. He also did not question her about her past sexual activity, though he admitted it could be "potentially relevant." Based on this, he concluded that "this was definitely a case of sexual abuse."

In rebuttal, Linda called Dr. Eric Rittenhouse, who, although qualified as an expert in gynecology and obstetrics, had no specific training in the area of child sexual abuse. He examined Cathy in December 2003. Dr. Rittenhouse's report was admitted into evidence. He characterized as "disturbing" Dr. Decker's testimony that he was able to detect physical evidence of penetration two months after it had allegedly occurred.

According to Dr. Rittenhouse, the posterior fourchette region does not take a long time to heal, "unless there was an ongoing problem." He also indicated that tampons or digital contact can account for a tear to the posterior foruchette. Based on his examination almost six months later, Dr. Rittenhouse indicated it was "impossible" for him to testify as to whether a tampon or a finger had been inserted into Cathy's vagina. In his opinion, there was no evidence of any aberrant vaginal sexual contact. He could not rule out sexual touching or fondling.

DYFS called Martha Peters Rezeli as an expert in the area of child sexual abuse. Specific to this case, the court also recognized Rezeli's expertise to encompass "non-offending parents." DYFS retained Rezeli to assess the potential risk posed to Cathy by Linda's attitude and actions involving the allegations of sexual abuse. When she prepared her April 8, 2004 risk assessment report, Rezeli was aware that Cathy had recanted.

Rezeli's report contained a description of an interview she conducted with Linda about Lawrence's 1991 criminal conviction. She asked Linda a series of questions regarding her knowledge of Lawrence's criminal history and inquired about what impact, if any, it had on her decision to marry him. According to Rezeli's risk assessment report, Linda indicated that the conviction played no role in her decision to marry Lawrence. This was elucidated in the following exchange:

LINDA: [ ] I know the [victim in the 1991 case], I was friends with the girl's mother and her whole family before I met [Lawrence] so I know what the girl was like [ ]. I had known that she was after him and wanted to date him that she thought he was awesome, I had no idea who she was talking about. I didn't know until [Lawrence] showed me the papers when we decided to be exclusive. I said, 'Oh my God, you're the one.' I had known about the situation before we even started.

REZELI: [H]ow old [was] the girl [and] how old was [Lawrence]?

LINDA: I think the age difference was nine years, I believe she was ten or eleven and he was eighteen or nineteen.

REZELI: [What] explanation [did Lawrence] offer [you] regarding the sex offense?

LINDA: He made a mistake.

REZELI: [What was your] reaction when he told [you] of the offense?

LINDA: I said I already knew about the situation.

REZELI: [Did] that change anything for [you]?

LINDA: *No. It was a sexual contact, he touched her breast once.*

REZELI: [H]ow [was] the incident discovered?

LINDA: Actually, it took a long time. The two families ended up feuding.

REZELI: [Did you know] what they were feuding over?

LINDA: No, the next thing you know, I'm trying to think about time frames and it was some time after that and the girl said he did this.

REZELI: [Did he] admit his conduct?

LINDA: Yes he did.

REZELI: [Did you have] any concerns about his being with [your] daughter?

LINDA: No, never. Because I know this girl and she was already sleeping with boys around town.

(Emphasis added.)

In this context, Rezeli found Linda's decision to let Lawrence resume cohabitating with her daughter "alarming." The message this action sends to a child-victim of sexual abuse is one of disbelief and abandonment. It casts into doubt whether the abuse actually occurred and, if it did, whether it is a significant event in her mother's eyes. Furthermore, in light of Lawrence's criminal conviction in 1991, Rezeli found it troubling that Linda permitted him to have access to Cathy when the two began dating a year later.

Rezeli concluded that Linda was not able to adequately protect Cathy from Lawrence, because she did not believe a sexual assault could have taken place. She characterized Linda's support for Cathy as "superficial," and recommended that she receive education to increase her sensitivity to and awareness of the signs of sexual abuse, particularly in children, and undergo joint therapy with her daughter.

To rebut Rezeli's testimony, Linda called clinical psychologist Dr. Charles J. Most. In his opinion, Linda is an "adequate parent who has the psychological capacity to protect the daughter." On cross-examination, he acknowledged that at the time he reached this conclusion he was not aware of Lawrence's 1991 criminal conviction. Although, in his opinion, it was not uncommon for individuals in Linda's circumstances to withhold material information, he, nevertheless, found this omission significant.

Dr. Most characterized Linda's statements to Rezeli concerning the details of Lawrence's conviction as "defending her husband." He did not believe the statements revealed an unwillingness to protect her daughter in this case. He testified that Linda would protect Cathy only if she was convinced that the abuse had in fact occurred. In his opinion, Linda's decision to allow Lawrence back

into the home was prompted by her belief that her daughter's recantation was truthful.

DYFS's final expert opinion evidence was received by the court in the form of a report prepared by psychologist Norman Weistuch. The report was admitted into evidence pursuant to *R.* 5:12–4(d). After interviewing Cathy and reviewing all available reports and records of the case, Dr. Weistuch opined that both Cathy and Linda were in denial about the facts surrounding Lawrence's life and his possible molestation of Cathy. Under these circumstances, neither Linda nor Cathy were "credible reporters about the level of risk which might be possible here."

The court admitted into evidence two letters written by the sex abuse therapist retained by DYFS to counsel Cathy. The first letter, dated March 31, 2004, addressed to the court, was written by the therapist in support of relaxing the court ordered restraints to permit Cathy to attend a family wedding that Lawrence was also expected to attend. In this letter, the therapist indicated that Cathy "continues to deny all allegations made and remains adamant." The second letter, dated May 3, 2004, is authored by the same therapist, although it is signed by both the therapist and her apparent supervisor. Addressed to DYFS caseworker Lisa Valanzola, this letter clarifies and qualifies the earlier reference to Cathy's alleged recantation:

> The [March 31, 2004] letter was intended to be a narrowly focused opinion that only related to [Cathy's] attendance at the wedding. Nothing should be implied from this letter as to an opinion about the allegations of this case. Our sole function as therapists is to assist [Cathy] and her family with emotional issues around these events. I hope this clarifies our position and we apologize for any confusion that may have been inadvertently caused.

At the end of the fact-finding hearing, the court excluded from evidence both formal statements given to prosecutor's investigators by Lawrence and Cathy's friend Teresa. The court also denied the Law Guardian's application to have Cathy testify *in camera.* Thus, the only evidence of Cathy's recantation came from Linda's hearsay description of what Cathy, allegedly, had said to her.

## V

### *The Decision of the Court*

The hearing judge issued a letter-opinion in which she made specific factual findings. Among those findings were the following:

> On June 9, 2003, the mother heard the child speaking to [Teresa] on the telephone. The child was yelling at [Teresa] and was accusing her of pressuring her to lie and that she had only said what she told the police because she thought the step-father, who she believed had a temper, might get anger management help. The mother testified that although the child and the step-father had had a good relationship overall, the step-father did at times raise his voice when addressing the child and scolded her when she did not do her homework and household chores, which the child resented. After the child got off of the phone, she told her mother that the allegations were false.

The court thus concluded that DYFS had failed to present sufficient evidence to corroborate the child's initial statement that she had been sexually molested by her stepfather. Without such corroboration, the court reasoned, "there is insufficient evidence against the mother to find that she abused or neglected the child."

The court also found, however, that even assuming there was evidence corroborating the child's initial account of molestation, the mother's unilateral decision to permit her daughter's alleged molester to return to the family residence did not constitute abuse or neglect. The court explained its reasoning as follows:

> It was not until the mother had had "several hundred" discussions with her daughter and had determined there was not any merit to the allegations that she considered bringing the step-father back into the home. The child also repeatedly asked that the step-father come back home. Before the mother permitted the step-father back into the home, she also contacted the Division and urged them to talk to her child. The Division did not respond, having seemingly lost interest in the case. *After discussing the matter with her attorney, the mother determined that it would be acceptable to permit the step-father back into the home.* She did not make an impulsive decision to let the step-father back in her home. (Emphasis added.)

Thus, under the court's analysis, the reasonableness of Linda's decision to let Lawrence back into the house is dependent upon two factors: (1) the substance of conversations she had with her daughter; and (2) the failure of DYFS to respond, in a timely

manner, to Linda's repeated requests to re-interview Cathy to confirm her recantation.

## VI

### *Analysis of the Decision of the Family Part*

We will begin our analysis by reaffirming certain basic principles of appellate review. When a court acts as fact-finder, its findings of a witness's credibility are entitled to deferential respect by the reviewing court. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974). Such findings are only binding on appeal, however, when they are supported by competent, substantial and credible evidence. *Ibid. See also Cesare v. Cesare*, 154 *N.J.* 394, 411–12, 713 *A.2d* 390 (1998).

Furthermore, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." *Cesare, supra*, 154 *N.J.* at 413, 713 *A.2d* 390. A "trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.' " *In re Guardianship of J.N.H.*, 172 *N.J.* 440, 472, 799 *A.2d* 518 (2002) (quoting *In re Guardianship of J.T.*, 269 *N.J.Super.* 172, 188, 634 *A.2d* 1361 (App.Div.1993)).

With these legal principles to guide us, we will now review the judgment of the Family Part. The court divided its decision into two parts. In the first part, the court concluded that DYFS had failed to present sufficient evidence to corroborate the child's initial allegations of molestation. Without such corroborative evidence, the child's statement alone cannot, as a matter of law, support a finding of abuse or neglect. *N.J.S.A.* 9:6–8.46a(4).

In the second part, the court concluded that, even if the child's statement had been corroborated, Linda's decision to permit Lawrence to return home did not place Cathy at risk of being abused or neglected. Based on these two findings, the court concluded

that DYFS had failed to prove, by a preponderance of the evidence, that Cathy had been abused or placed at risk of being abused by her mother's actions. We conclude that these two findings are irremediably tainted by legal error and not supported by credible and competent evidence.

This case is not about a mother directly abusing or neglecting her child. The danger posed to the child here was created by the mother's critically flawed decision to allow her daughter's alleged molester back in the family residence. We agree with the hearing judge that the mother did not make this decision impulsively. Unfortunately, that fact only serves to reveal the profoundly disturbing process at work here.

By her own admission, before taking any action, Linda discussed the matter with her attorney. When she decided to permit Lawrence to return home on October 15, 2003, she was aware: (1) that DYFS had expressly conditioned Cathy's remaining at home upon her promise not to permit Cathy to have any contact with Lawrence; (2) that the case was still an open file in the Warren County Prosecutor's Office; and (3) that DYFS was actively investigating the case, as evidenced by her June 25, 2003 meeting with caseworker Riehl and Cathy's July 13, 2003, medical examination with Dr. Decker. Despite these considerations and the availability of independent counsel, Linda offered no explanation as to why she decided, unilaterally, to repudiate her agreement with DYFS without first attempting either to obtain DYFS's approval or to seek judicial intervention.

The record clearly shows that Linda is not an unsophisticated individual. She testified that, from the early stages of DYFS's investigation, she was keenly aware of the importance of creating and maintaining an accurate written record of events as they transpired. A simple letter to DYFS, documenting Cathy's recantation and requesting a prompt decision on whether Lawrence could return home, would have clearly established Linda's good faith and shifted the onus to DYFS to justify its inaction or untimely response. Her failure to have proceeded in such a

fashion seriously undermines her credibility and raises significant questions about her supposed reasons for permitting Lawrence to return to the marital residence.

Other evidence also raises serious concerns about Linda's ability to properly assess the potential risks involved in permitting Lawrence to cohabitate with her daughter. According to the risk assessment specialist retained by DYFS, Linda significantly minimized Lawrence's culpability in the 1991 sex abuse case. She ascribed the principal responsibility for what had occurred to the child-victim's alleged promiscuity and displayed either a disturbing gullibility or an irrational resistance to the truth by accepting Lawrence's characterization of the incident as a mere "mistake."

Finally, the centerpiece in the court's analysis is its unqualified acceptance of Linda's account of her daughter's alleged recantation. In her written decision, the hearing judge emphasized that Linda's action was driven by the "hundreds" of discussions she had with her daughter in which the child allegedly reaffirmed her June 9, 2003 recantation and pleaded for Lawrence's return. Because the court declined to interview Cathy *in camera*, the only evidence providing any details of the recantation came exclusively from Linda herself.

When this issue came to light at the hearing, the court overruled the DAG's timely hearsay objection, and accepted Linda's counsel's proffer that the testimony was not solicited to establish the existence of the recantation, but to offer an explanation for Linda's subsequent actions. Notwithstanding this limitation, Linda's testimony describing the details of the recantation, including Cathy's alleged reasons for her calumny, became the focal point of the court's analysis and, in the court's view, the principal justification for Linda's actions.

■ *N.J.S.A.* 9:6–8.46b directs that judicial determination of abuse or neglect be made on "only competent, material and relevant evidence." There is no question that Linda's account of what her daughter told her, *i.e.,* her recantation, constituted

inadmissible hearsay, *N.J.R.E.* 801(c). Unfortunately, the hearing judge relied on this incompetent evidence to buttress her conclusion that the child had actually recanted and as direct proof of her reasons for doing so.

In *New Jersey Division of Youth & Family Services v. J.Y.*, 352 *N.J.Super.* 245, 800 *A.*2d 132 (App.Div.2002), we emphasized that, because a judge's determination in abuse and neglect cases "has a profound impact on the lives of families embroiled in this type of a crisis," factual findings must be based on competent reliable evidence. *Id.* at 264–65, 800 *A.*2d 132. *See also New Jersey Division of Youth & Family Services v. A.R.G.*, 179 *N.J.* 264, 286, 845 *A.*2d 106 (2004). This judicial obligation is no less important when the court's findings lead to the conclusion that a child has not been abused or neglected. Under its *parens patriae* responsibility, a court is responsible to insure: "(1) that no child should be exposed to the dangers of abuse or neglect at the hands of their parent or guardian; and, commensurately, (2) that no parent should lose custody of his/her child without just cause." *J.Y., supra,* 352 *N.J.Super.* at 265, 800 *A.*2d 132.

Here, the hearing judge's conclusion that the mother's actions did not expose her thirteen-year-old daughter to an unreasonable risk of being sexually abused by her stepfather was not supported by credible, competent evidence. The court's analysis untenably relied on incompetent hearsay testimony. The court also failed to duly consider evidence undermining the mother's professed rationale for the need to resort to unilateral, self-help measures and disregarded expert opinion calling into question her ability to protect her daughter from the risk of sexual abuse posed by her stepfather.

## VII

### *Evidentiary Rulings*

We will now turn our attention to a series of evidentiary rulings made by the court which, in our view, erroneously excluded evidence essential to a sound and complete fact-finding hearing.

## Inter-agency Cooperation and Megan's Law

In the course of its investigations, DYFS became aware that Cathy's stepfather had been convicted in 1991 of sexually molesting an underage girl. Specifically, Lawrence, then twenty-six years old, pled guilty to one count of third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a, and one count of third-degree aggravated criminal sexual contact, *N.J.S.A.* 2C:14–3a. He was sentenced to an aggregate term of three years probation, conditioned upon serving 270 days in the Warren County Correctional Center, ordered to submit to mental health evaluations and to comply with any recommended treatment. He also became subject to the provisions of Megan's Law. *N.J.S.A.* 2C:7–2b(2).

As defined in the Criminal Code, aggravated criminal sexual contact may involve a variety of different scenarios, including sexual contact by the actor with a child who is at least thirteen but less than sixteen years old, and where the actor is the guardian or stands in *loco parentis* within the household. *N.J.S.A.* 2C:14–3a; *N.J.S.A.* 2C:14–2a(2)(c). "Sexual contact" is defined as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." *N.J.S.A.* 2C:14–1d.

The Code's definition of third-degree endangering the welfare of a child also encompasses a variety of possible factual settings. One basis for culpability involves engaging in "sexual conduct which would impair or debauch the morals of the child [under the age of sixteen], or who causes the child harm that would make the child an abused or neglected child as defined in [*N.J.S.A.* 9:6–1], [*N.J.S.A.* 9:6–3] and [*N.J.S.A.* 9:6–8.21]." *N.J.S.A.* 2C:24–4a.

Upon discovering this information, the DAG representing DYFS requested that the Warren County Prosecutor's Office make available for inspection Lawrence's Megan's Law file as well as information gathered by the police in the course of their initial investigation. Inexplicably, this request was met with apparent

resistance, requiring the DAG to file a formal motion for access before the Family Part judge hearing this case.

In its response, the Prosecutor's Office requested that, before directing the release of *any* information to the DAG, the court should make a threshold determination that the information was relevant to the issues before it. With respect to the Megan's Law file, the Prosecutor requested the court to review the file *in camera* and outside the presence of all counsel, including the DAG.

DYFS argued that it had the right to inspect Lawrence's Megan's Law file because it may contain information relevant to: (1) corroborating Cathy's initial statement of molestation; (2) determining whether Lawrence had a proclivity to commit sexual offenses against girls under circumstances similar to Cathy's, *i.e.*, *modus operandi* evidence; and (3) undermining Lawrence's account of his interactions with Cathy. After hearing oral argument, the court declined to review the Megan's Law file *in camera*. The court also refused to order the prosecutor's office to make available to DYFS copies of investigation reports, witness statements, criminal complaints, criminal accusation and other documents relating to the 1991 criminal conviction. The court based its ruling on DYFS's failure to establish a casual link between the 1991 case and Linda's decision to permit Lawrence to return home.

We begin our discussion of this issue by noting the Warren County Prosecutor's Office's guarded response to the DAG's initial request for access to a 1991 criminal file that, at the time, had been closed for nearly a decade. We would expect that a request of this kind, made by a representative of our State's highest law enforcement agency, would have been better received by its subordinate branch. In our view, the prosecutor's decision to require DYFS and the Attorney General to seek judicial intervention to procure access to this information runs counter to the spirit of cooperation envisioned by the Legislature when it adopted both Title 9 and Megan's Law.

We emphasize that DYFS's request here did not involve disclosure of information pertaining to an active file. Lawrence pled guilty in 1991 and his probation file was closed in February of 1994. Thus, the prosecutor's position was not intended to protect the integrity of an ongoing investigation or avoid compromising a future prosecution. Its position seemed driven only by an inordinate and, in our view, puzzling preoccupation with protecting Lawrence's privacy rights and, as a consequence, preventing DYFS from reviewing information possibly related to an active child sexual abuse case.

In *State v. P.Z.*, 152 *N.J.* 86, 100, 703 *A.*2d 901 (1997), Chief Justice Poritz noted that "[t]he criminal justice system acts separately, but in tandem with the civil system, to investigate and prosecute those who abuse and neglect children." The purpose of the child protection laws, codified in Title 9,

> is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. The safety of the children served shall be of paramount concern. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that *the legal rights of such children are fully protected.*
>
> [*N.J.S.A.* 9:6–8.8a (emphasis added).]

The "legal rights" of children extend to both the civil remedies available in Title 9 and the protections afforded them through the enforcement of our State's criminal laws. A parent who abuses his or her child may not only lose custody of that child, *N.J.S.A.* 9:6–8.51, but may also be found guilty of committing a fourth-degree criminal offense. *N.J.S.A.* 9:6–3.

As we noted in *Division of Youth and Family Services v. Robert M.*, 347 *N.J.Super.* 44, 63, 788 *A.*2d 888 (App.Div.), *certif. denied,* 174 *N.J.* 39, 803 *A.*2d 635 (2002), "[t]he statutory scheme and administrative regulations of the Division envisage cooperation between the agency and law enforcement." *N.J.A.C.* 10:129–1.1(a) requires DYFS "to refer to county prosecutors all cases that involve suspected criminal activity on the part of a child's parent, caretaker or any other person." The Family Part is also required

to forward prosecutors a copy of any complaint alleging child abuse. *N.J.S.A.* 9:6–8.25a.

This referral process is not a one-way street. Prosecutors are also statutorily required to report to DYFS any complaint "which amounts to child abuse or neglect." *N.J.S.A.* 9:6–8.25b; *N.J.S.A.* 9:6–8.10. The prosecutor's obligation to work collaboratively with DYFS does not end with the reporting phase. The existing regulatory framework requires a specific institutional mechanism of cooperation encompassing investigational and adjudicatory phases as well.

> In order to facilitate communication with the Division and coordinate handling of child abuse and neglect cases, each county prosecutor will designate an assistant prosecutor to serve as liaison to the Division's district office for such cases. The person so designated will be responsible for keeping the Division informed as to the course of action taken by the prosecutor. In addition, and to the extent practicable, each prosecutor will delegate to one or several investigators responsibility for conducting all investigations in child abuse and neglect cases.
> [*N.J.A.C.* 10:129–1.5(a).]

In adopting Megan's Law, the Legislature created a system of registration for "sex offenders [ ] who commit [ ] predatory acts against children." *N.J.S.A.* 2C:7–1b. Such a system was intended to provide "law enforcement" with information "critical to preventing and promptly resolving incidents involving sexual abuse...." *Ibid.*

As it did in Title 9, the Legislature provided in Megan's Law a mechanism for information-sharing between the agencies charged with protecting our State's children. *N.J.S.A.* 2C:7–5a requires "[r]ecords maintained pursuant to this act shall be open *to any law enforcement agency* in this State, the United States or any other state." (Emphasis added.) DYFS, as our State's lead law enforcing agency in the area of child protection, is indisputably covered by this language.

■ Against this background, we hold that, absent compelling reasons grounded in preserving the integrity of pending or ongoing criminal cases, prosecutors should view their relationship with DYFS as a collaborative enterprise, designed and intended to

promote the overarching public policy running through both Title 9 and Megan's Law: protecting our children from those who would do them harm.

The norm, in this collaborative environment, is for information to be liberally shared between these two public agencies. In this context, the need for judicial resolution of disputes arising as a result of an application filed by one agency against the other seeking injunctive relief, either to protect or to disclose information, should be a rare occurrence. In such a case, the party bringing the action would have the burden to establish, as a threshold matter, that (1) all other means for amicable resolution have been exhausted; and (2) judicial intervention is required to protect the integrity of an ongoing investigation or, in the case of a disclosure order, to establish an element of proof in an abuse or neglect case.

On their face, the offenses to which Lawrence pled guilty in 1991 bore a striking similarity to the molestation Cathy initially described to the prosecutor's investigators. In this light, DYFS had a right, indeed a duty, to ascertain whether the factual circumstances of that earlier crime contained any information that could have probative value in the present case. The trial court thus erred when it precluded DYFS from reviewing witness statements, investigation reports and other materials related to Lawrence's 1991 conviction.

We also conclude that this information had a clear connection to evidence potentially admissible under *N.J.R.E.* 404(b). In his statement to the prosecutor's investigators, Lawrence admitted to: (1) covering Cathy while she slept in such a manner that she could have "perceived" that he touched her breasts; and (2) entering the bathroom while Cathy was in the shower, ostensibly to urinate.

Under *N.J.R.E.* 404(b), evidence of other crimes may be admitted to prove motive, intent, preparation, plan or lack of mistake or accident, "when such matters are relevant to a material issue in dispute." Here, Lawrence's "intent" when he covered Cathy while

she slept and/or when he entered the bathroom while she showered is indisputably material to determining whether his actions were benign or indicative of an inappropriate sexual motivation. Details of his earlier crime may also reveal similarities in the "plan" or "preparation" utilized by Lawrence to gain access to the victim.

Through this analysis we are not, of course, prejudging the merits of any potential *N.J.R.E.* 404(b) motion. A court confronted with such an application must apply the standards for admissibility articulated by our Supreme Court in *State v. Cofield*, 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992), which are also applicable in civil cases. *See Hill v. N.J. Dep't of Corrections*, 342 *N.J.Super.* 273, 304, 776 *A.*2d 828 (App.Div.2001), *certif. denied*, 171 *N.J.* 338, 793 *A.*2d 717 (2002).

We must emphasize, however, that the error committed by the trial court here involved precluding DYFS from even reviewing the file of the 1991 conviction. The court determined that the particulars of Lawrence's 1991 conviction were not relevant to the case against Linda, because DYFS could not show how this information influenced her decision to permit Lawrence back in the house. The court's conclusion was not correct. The court failed to take into account the factors we have previously discussed. However limited the appropriate use of that evidence might be, the details of Lawrence's 1991 conviction are directly relevant[7] to establishing whether he in fact molested Cathy commencing sometime in 2002. The information contained in the Megan's Law file may also be relevant to determining the level of potential threat Lawrence may pose to underage girls, specifically those who are within his immediate sphere of control and responsibility.

---

[7] *N.J.R.E.* 401 defines relevant evidence as "evidence having a tendency in reason to prove or disapprove any fact of consequence to the determination of the action."

## In Camera Interview of Alleged Victim

Although he was "contemplating" calling her as a witness, Linda's counsel was the first to request that the hearing judge interview Cathy *in camera*. The judge denied the application because, in her view, "this is not a child interview [case] where I'm trying to figure out what her feelings are towards her parents."

Two weeks later, the Law Guardian requested that the court permit Cathy to make a statement *in camera* "to be able to tell her story." According to the Law Guardian, Cathy considered the prospect of testifying in open court, subject to cross-examination, "too intimidating." She thus requested the "opportunity to . . . talk to you [the judge] and to be able to tell you what happened." The following colloquy reveals the basis for the court's denial of the Law Guardian's request:

THE COURT: She has to testify—well, she doesn't have to, it all depends on who's going to—

[LAW GUARDIAN]: Right.

THE COURT:—who wants to call her and be subject to cross-examination, given the allegations that she has made . . .

[LAW GUARDIAN]: Okay.

THE COURT: All right. When a child is 12 or over a child has to testify, and if they don't, there's certain repercussions to the victim's case. [ ]

[LAW GUARDIAN]: Yeah, I can't think of any—I mean, I don't have any other way of doing it even if we could. Just putting her on the stand is just too traumatic to her, so—

THE COURT: Well, it's—

[LAW GUARDIAN]:—I couldn't—

THE COURT:—a decision—whoever wants to call her as a witness, that's their decision to make,—

[LAW GUARDIAN]: Right.

THE COURT:—but I can't call her into chambers and just talk to her about it because I'm not an advocate.

[LAW GUARDIAN]: Right. I understand that.

THE COURT: First of all, it's not appropriate under the rules of evidence. Number two, it's just—I'm not—again, I'm not an advocate. I don't—I can't take a position and won't take a position. And the attorneys or the other parties are available for her or must be made—

[LAW GUARDIAN]: Couldn't she make the statement to you and—

THE COURT:—must have the opportunity to question her. Exactly.

[LAW GUARDIAN]: Right. I understand.

THE COURT: Absolutely.

[LAW GUARDIAN]: Okay.

THE COURT: I mean, it's so basic that it's not like this is a custody matter or even a D.Y.F.S matter where I'm—out a child's feeling about a parent and I'm asking very unopen-ended questions, not leading, not threatening at all, to see how a child is reacting.

This is a serious issue where she's making very specific allegations, and . . . no one is exempt from cross-examination once they get on the stand and subject themselves to direct examination.

So it's up to the—

[LAW GUARDIAN]: Okay.

THE COURT:—attorneys whether or not she will—whether you wish to call her as a witness, that's completely up to you, or if she's subpoenaed, she has to testify, also.

In *New Jersey Division of Youth & Family Services v. L.A.*, 357 *N.J.Super.* 155, 814 *A.*2d 656 (App.Div.2003), we determined it was reversible error for a judge, in an abuse and neglect fact-finding hearing, to refuse to interview *in camera* the twelve-year-old victim of abuse. Similar to the allegations here, DYFS charged the mother in *L.A.* with permitting her husband, who had sexually assaulted his twelve-year-old daughter, to have contact with the victim, in violation of existing restraints. *Id.* at 158, 814 *A.*2d 656. The *L.A.* judge improperly admitted into evidence a prior out-of-court statement of one of the children and based several key factual findings upon this statement. The judge also refused to interview the twelve-year-old victim *in camera* in order to ascertain the details of how her father had come in the home, because it "would be too traumatic." *Id.* at 168, 814 *A.*2d 656.

In reversing the judge's findings of abuse and neglect, we noted that "*R.* 5:12–4[b] allows for the testimony of a child to be taken privately in chambers or under other measures necessary to protect the child." *Ibid.* Although trial judges have broad discretion in the way they conduct abuse and neglect cases, a judge's factual findings must be based on competent reliable evidence. Thus, when resolution of a material factual dispute depends upon a child witness's testimony, the *in camera* interview "affords the trier of fact the opportunity to assess the credibility of the child,

their powers of communication and observation, and their demeanor." *Ibid.*

As in *L.A.*, the judge, in this civil proceeding, mistakenly exercised her discretion by failing to conduct an *in camera* interview of Cathy as authorized by *R.* 5:12–4(b). This case is entirely dependent on Cathy's account of what occurred, not only between her and her stepfather but between her and her mother. The judge also improperly relied on Linda's hearsay description of the details of her daughter's recantation as well as her reasons for allegedly fabricating her allegations of abuse.

## VIII

We are compelled to comment upon the manner DYFS conducted its investigation of this case. The allegations of abuse first surfaced on May 30, 2003. DYFS was brought into the case by the Warren County Prosecutor's Office that same day. The child was immediately separated from her family to allow the stepfather time to move out of the home. The investigation then proceeded with an agreement in place preventing the stepfather from having any contact with the child.

From this point, the investigation proceeded without any apparent sense of urgency. The child's medical examination did not take place until July 13, 2003. The report of the examination was not prepared until November 13, 2003. The caseworker assigned to the case could not recall when he was first told about the child's recantation and the child was not re-interviewed until December 2003.

Under these circumstances, it seems obvious to us that a child, in Cathy's place, may feel responsible for thrusting her family into an emotional quagmire. This kind of misguided guilt can only exacerbate the psychological trauma associated with accusing a close family member of committing acts that profoundly violate the trusting relationship a child ordinarily enjoys with a parent or parent-like figure. Other family members may also communicate,

wittingly or not, the message that "all was well with us before you started this mess." Such a message need not be directly expressed. If, as here, the removed individual is also a central figure to another member of the family, an innocent gesture or sigh by that affected individual may be mistakenly viewed by the child as an indication of disapproval or reproach. The longer the investigation by law enforcement authorities takes, the greater the pressure on the child to take action to ease the tension on the family brought about by his or her own accusation.

DYFS owes a special duty to these deeply vulnerable families to closely monitor developments as they may unfold, in order to be in the best possible position to offer assistance when needed. DYFS caseworkers assigned to these emotionally fragile families must be thoroughly familiar with the facts of the case, document contacts with family members and impress upon professionals retained to investigate the case the need to complete their tasks with all deliberate speed.

Unfortunately, the record shows that DYFS failed to give this family in crisis the type of attention it deserved. Once it became aware of the recantation, DYFS should have taken immediate steps to arrange for the child to be re-interviewed. The fact that, to this date, DYFS is not even in possession of the child's recantation statement raises serious questions about the manner in which DYFS has proceeded in this case.

## IX

The final issue we will address concerns the applicability of *N.J.S.A.* 9:2–4.1b. DYFS argues, for the first time on appeal, that the hearing judge erred when she failed to consider Lawrence's return to the home in light of the following statutory restrictions:

Notwithstanding any provision of law to the contrary, a person convicted of sexual contact under *N.J.S.* 2C:14–3 or endangering the welfare of a child under *N.J.S.* 2C:24–4 shall not be awarded the custody of or visitation rights to any minor child, except upon a showing by clear and convincing evidence that it is in the best interest of the child for such custody or visitation rights to be awarded. However, a court that awards such custody or visitation rights to a person convicted of sexual

contact under *N.J.S.* 2C:14–3 or endangering the welfare of a child under *N.J.S.* 2C:24–4 shall stay enforcement of the order or judgment for at least 10 days in order to permit the appeal of the order or judgment and application for a stay in accordance with the Rules of Court.

[*N.J.S.A.* 9:2–4.1b.]

██ Because DYFS did not raise this issue with the Family Part, we decline to consider it here. *Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.2d* 142 (1973). *See also American Civil Liberties Union of New Jersey v. County of Hudson,* 352 *N.J.Super.* 44, 72, 799 *A.2d* 629 (App.Div.), *certif. denied,* 174 *N.J.* 190, 803 *A.2d* 1162 (2002). We note, however, that the statute, on its face, applies only to cases where the court awards custody or visitation to an individual convicted of any of the enumerated crimes. In this case, Lawrence, as the affected individual, is not seeking custody or visitation. In fact, he is not even a party in the case.[8] The balance of the arguments raised by DYFS lack sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

## X

### *Conclusion*

The judgment of the Family Part dismissing this Title 9 abuse and neglect action is reversed. The matter is remanded for further proceedings consistent with this decision.

---

[8] The DAG indicated at oral argument that DYFS would move to amend the complaint to name the stepfather as a party if the case is remanded. The hearing judge can consider the statute's applicability to the stepfather's *de facto* status as the child's custodial parent if he were to become a party in the case.