THE STATE OF NEW JERSEY, RESPONDENT, v. TIMOTHY
J. DONOHUE, DEFENDANT-APPELLLANT.

Argued May 2, 1949—Decided June 20, 1949.

*Mr. Louis Santorf* argued the cause for the defendant-appellant.

*Mr. Donald G. Collester* argued the cause for the respondent.

The opinion of the court was delivered by

WACHENFELD, J.   Early Sunday morning, March 28, 1948, the body of Margaret Donohue was found in a vacant lot on a deserted, unlighted and unpaved street in Paterson, New Jersey.

The body was clothed in a coat, blouse, skirt, stockings, brassiere and undergarments.   Nearby was an open pocketbook and a short distance away, an umbrella the ribs of which were bent and others pushed into the ground.

The face was bruised and beaten.   There were no cosmetics or lipstick.   The hair was disheveled and uncombed.   The coat was open and the blouse torn.   The undergarments were ripped and the body exposed.   Both stockings were pulled and torn along the rear seam, indicating the body had been dragged to the spot where it was found.   There were no signs of a struggle, the only marks on the ground being a "drag

mark" leading from the heel of the left foot to a set of automobile tire prints on the sidewalk and unpaved road. The clothing was neither wet nor damp and there was no mud on the soles of the galoshes which were worn.

The autopsy disclosed that Mrs. Donohue had been beaten about the head and had died of cerebral concussion and hemorrhage. The stomach contents were removed and subjected to laboratory tests, showing they consisted of undigested particles of meat and potatoes. The stomach was two-thirds to three-quarters full and this together with the condition of the food, in the opinion of the medical examiner, indicated she had died about a half-hour after eating. From the temperature, the stage of *rigor mortis* and the examination of the stomach contents, it was estimated death occurred about nine o'clock the previous evening. The autopsy also revealed the presence of spermatozoa in the vagina, indicating recent intercourse.

The police visited the scene of the crime, roped off the area, took photographs, covered the body with a blanket and made casts of the tire prints, which were later found to match the tires of the appellant's car, which he admitted driving on the previous evening.

The victim's name was ascertained from a card in her handbag and a police officer was dispatched to her home in an endeavor to locate her husband, the appellant. This occurred at about seven A. M. He rang the bell and knocked on the door sufficiently loud to cause a dog inside to bark but otherwise there was no response. Later two other officers were sent to the house. They too rang the bell and knocked loudly and received no answer, whereupon they raised a window in the appellant's bedroom and thus aroused him. When the appellant opened the door of his house his eyes were clear, his face smooth and clean, his hair combed and in place, indicating that he was not in a heavy sleep as pretended. He was informed by the detectives that his wife had been murdered but he made no inquiry about where or how it had happened. He dressed carefully and leisurely, consuming nearly thirty minutes in the process.

Upon arriving at the scene where his wife's body was completely covered, the blanket was drawn back only far enough to permit him to see her face for identification purposes. At that time, although no one had accused him of the murder of his wife or intimated his guilt, he said, addressing a brother officer: "Joe, I know I have not been a good husband, but I certainly would never do a thing like this." He then walked to the police car, sat down and in the presence of two police officers remarked: "I would like to get the son-of-a-bitch that laid her," although, if innocent, he would not have known of the torn clothing and the other physical manifestations indicating recent sexual access.

Shortly thereafter the appellant was taken to the police headquarters, interrogated and later in the day booked as a material witness. Subsequently he was charged with murder and arrested pursuant to the warrant issued.

While he was held in custody as a material witness and before any complaint was made, detectives and police officers, using a key supplied by a neighbor, entered his house without a search warrant and without his knowledge or consent. They found the decedent's bed covered with a chenille bedspread, blankets and only one sheet, a soiled sheet being found in the clothes hamper. Broken pieces of china plate were discovered under the dining room rug, behind the kitchen stove and in the garbage pail. There appeared to be a fresh break in the wood of the bathroom door. In the attic a clean sheet was found lying alongside a trunk and on it were various articles apparently taken from the trunk, which was still about half full. A number of articles were seized and removed, including letters, a strong box, pillow cases, sheets, a compact and also the appellant's automobile, which was taken from the driveway alongside the home. The home was then padlocked by the police and no one was permitted to enter excepting police officials.

As a result a bill of complaint was filed in the Court of Chancery by the appellant against the chief of police and prosecutor of the county praying that the police authorities be ordered to remove the padlock so that the appellant's duly

authorized representative might enter. Such an order was signed by the Vice-Chancellor and the prosecutor and the police, in accordance with its mandate, removed the locks from the house. Thereafter a petition was filed in the Passaic County Court of Oyer and Terminer asking the return to the appellant of all articles seized from his home. The court, in dismissing the petition, decided that the application was collateral to the crime for which the defendant was being detained and that the court did not have jurisdiction to determine the possessory action on a motion before trial.

An application made to Supreme Court Justice Heher for a writ of *certiorari* to review this finding was denied without prejudice. After the appellant had been indicted for murder, another application for a writ of *certiorari* to review the findings of the Court of Oyer and Terminer was made to Supreme Court Justice Bodine, who likewise denied the same.

The case was tried in September, 1948, on an indictment for murder and the appellant was convicted of murder in the second degree and sentenced to twenty years' imprisonment, from which he now appeals.

The first point concerns the search of the appellant's house and the seizure of certain articles without benefit of search warrant. It is contended that the Court of Oyer and Terminer had jurisdiction and erred in not granting the prayer of the petition for the return of the articles so seized as they were taken in violation of the appellant's constitutional rights.

Even if error in this respect was committed, which we are not deciding, the conviction below could not be voided by such a collateral attack. After the applications to single Justices of the Supreme Court, no motion was ever made to the Supreme Court *en banc* although the appellant, under the then practice, had such a right. We know of no procedure by which a defendant can make an independent application for auxiliary relief and when the petition is denied, abandon the right of appeal then existing and make the alleged error the basis for setting aside a conviction subsequently resulting.

The articles alleged to have been seized in violation of the appellant's constitutional rights were offered in evidence

at the trial as part of the circumstantial evidence of the appellant's guilt. They were admitted without objection and, no question having been raised at the time as to their incompetency or their illegal seizure, the question cannot be raised for the first time in this court. *State v. MacQueen*, 69 *N. J. L.* 522 (*Sup. Ct.* 1903).

The next error cited is the admission of a death certificate prepared by the county medical examiner containing hearsay statements as part of the prosecution's direct proof.

*R. S.* 2:98–14 provides that a death certificate made according to law is admissible as *prima facie* evidence of the facts therein stated. It is urged that this statute is unconstitutional in so far as it allows hearsay evidence not based on the personal knowledge of the person making the certificate to be introduced into evidence as it violates *article* 1, *paragraph* 10, of the New Jersey Constitution of 1947 (*Art.* 1, *par.* 8, *Constitution of* 1844), which provide that an accused shall have the right to be confronted with the witnesses against him.

The point made may have merit but we are not called upon to decide here the constitutional argument advanced for this reason.

At the time the certificate was offered in evidence, the court, in ruling on its admissibility, said:

"There is no question but the death certificate is admissible as a public record, but the facts in it are not conceded."

And later in explaining the terms and conditions of its admission to the jury and answering the argument of counsel, the court ruled:

"It is only being admitted because it is a public and official record, but the contents, as I say, must be proven to your satisfaction."

At the conclusion of this last statement by the court, the record shows that the appellant's counsel said:

"That is fair enough."

It would therefore appear from the record and the comment of counsel that the objection made had been with-

drawn and, in view of the limitation placed upon the document by the court, its reception had been consented to. The record is barren of any further objection, criticism or exception to the court's ruling in this regard and under these circumstances we do not believe the admission of the death certificate can be said to constitute error injurious to the appellant justifying a· reversal.

■ ■ Complaint is made of the admission into evidence of testimony relating to prior beatings inflicted by appellant on his wife and, in particular, evidence of an occurrence on December 31, 1940. True, the prosecution is not entitled to introduce evidence of the commission by an accused of other similar offenses in order to show he committed the offense for which he is being tried. *State v. Raymond,* 53 *N. J. L.* 260 (*Sup. Ct.* 1891); *Bullock v. State,* 65 *N. J. L.* 557 (*E. & A.* 1900). Such evidence is admissible, however, to show malice or ill will on the part of an accused toward the victim or when it tends logically to prove against him some particular element of the crime for which he is being tried. *State v. Lederman,* 112 *N. J. L.* 366 (*E. & A.* 1934). In *State v. Schuyler,* 75 *N. J. L.* 487 (*E. & A.* 1907), the court held admissible evidence of an altercation between the accused and the deceased that had taken place some ten or eleven years prior to the crime charged. Speaking for the court, Chief Justice Gummere said:

"The logic of this deliverance is unanswerable, and underlies the settled rule of the criminal law that the remoteness of the time of such occurrences goes solely to their weight and not to their admissibility."

Similar language has been used in holding prior statements made by an accused admissible to show the state of his feelings toward the victim and the motive for commission of the crime charged. *State v. Lieberman,* 80 *N. J. L.* 506 (*Sup. Ct.* 1911); affirmed,·82 *N. J. L.* 748 (*E. & A.* 1912); *State v. Overton,* 85 *N. J. L.* 287 (*E. & A.* 1913). This rule is discussed and endorsed in cases collected in 2 *Wigmore, Evidence* (3rd ed. 1940), §§ 306, 396, 397.

The next point raised is that the trial court erred in denying a motion for a judgment of acquittal and that the State's case, which is based entirely on circumstantial evidence, does not directly connect the appellant with the murder of his wife.

It is too well settled to require further comment that conviction may be had on circumstantial evidence alone provided the evidence is so clear and strong as to convince the jury, beyond reasonable doubt, of the guilt of an accused. In the case *sub judice,* there was abundant evidence from which the jury might infer guilt. In our opinion, the facts brought out at the trial clearly made the question of guilt or innocence one for the determination of the jury and it was for them, rather than for the court, to decide whether the evidence was such as to satisfy them of appellant's guilt beyond a reasonable doubt. The court below properly denied the motion for a judgment of acquittal.

Lastly it is urged the verdict was against the weight of the evidence.

A verdict will not be set aside as against the weight of the evidence except where it is clearly the result of mistake, passion, prejudice or partiality. *State v. Boccadoro,* 105 *N. J. L.* 352 (*E. & A.* 1929); *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.* 1935); *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948); *State v. Cordasco,* 2 *N. J.* 189, 66 *A.* 2d 27 (*Sup. Ct.* 1949).

The State sought to prove a chain of circumstances pointing to appellant's guilt. The theory advanced was that the appellant and his wife had supper together at home, at about eight o'clock on Saturday evening, March 27, 1948, and shortly thereafter had sexual relations. A quarrel occurred in the course of which appellant beat his wife so severely that she subsequently died of the injuries sustained. He then left the house, leaving his wife lying on her bed, and returned in the early morning. He dressed the body and carried it in his car to the lot on Potomac Avenue where it was later found and there arranged the body and ripped the clothing in such a way as to make it appear she had been the victim

of an attack by persons unknown. He returned to the house to feign sleep until such time as the body should be discovered.

Appellant counters this hypothesis by showing his activities and movements during the fatal night. He had supper at home and then lay down to nap; his wife wakened him at about eight o'clock and said she was going to a friend's house and, later, to a tavern in the neighborhood and asked him to call for her there about two o'clock, to which he assented. He awoke again about ten o'clock, dressed, left the house and went to a diner to have something more to eat. Afterward he went home briefly to change his shirt and pick up his service revolver and then went to two taverns, other than the one where he was to meet his wife, and, from eleven o'clock until two-twenty, visited back and forth between the two. He drove to the tavern where his wife had said she would be but found it closed and so returned to the place he recently left. When it closed, about three o'clock, he went to a diner with some friends for coffee and finally returned home about four, read a paper, checked the furnace, let the dog in and went to bed on the studio couch in the spare bedroom. He states he knew nothing more until he was wakened by the police after the discovery of his wife's body.

The State's theory of what occurred and the evidence by the appellant, for the most part, do not conflict. His movements from place to place during the latter part of the evening, which he and others testified to, are not inconsistent with the hypothesis advanced by the State. The crux of the matter is what occurred earlier in the evening.

██ The evidence by the State in support of its theory is largely circumstantial. In order to justify a conviction on such evidence, all of the circumstances not only must concur to indicate a defendant's guilt but they must also be inconsistent with any other rational conclusion. It is not enough that they coincide to render probable the hypothesis advanced by the prosecution; they must also exclude beyond a reasonable doubt every other hypothesis except that of guilt. *Jackson v. Delaware, L. & W. R. Co.,* 111 *N. J. L.* 487 (*E. & A.* 1933). Where the essential facts are proved, and where

they cannot be rationally explained on any theory other than that the defendant is guilty of the crime charged, such circumstantial evidence will be considered as convincing as evidence of a direct and positive character.

After a careful examination of the entire record, we believe the evidence introduced by the State meets this exacting test. Appellant says his wife went out about eight o'clock on the evening of March 27th, intending to visit friends and then repair to a nearby tavern to await his arrival at two o'clock in the morning. A heavy rain fell between six-thirty and nine-thirty that night and, although the decedent owned a raincoat, it was found hanging in her closet, after her death, unused. When her body was discovered it was clad in a cloth coat, a soiled blouse and a skirt and she was not wearing lipstick or other cosmetics nor had she any with her, despite a large assortment at home. These facts are not consistent with the suggestion that she was going out on a rainy night to visit with friends or spend a social evening in a tavern. Moreover, the record shows she did not call on the friend whose house the appellant gives as her stated destination, nor is there evidence of any other person or place she visited that evening. The time of death estimated by the county medical examiner was nine o'clock in the evening, before the ending of the rain. This, together with the fact that the body, when found, was clad in dry clothes although the ground where it lay was damp and muddy, refutes and negatives appellant's testimony that she left the house at eight o'clock during the storm.

There was no mud on the soles of the decedent's galoshes but there was a muddy spot on the back of the heel of one of them and a "drag mark" on the ground leading from it toward the automobile tire marks on the sidewalk nearby. The tire marks matched the tires of the appellant's car, which he admitted driving on the evening in question. There was no sign of a struggle at the place where the body was found. The clothing and body showed evidence of recent sexual intercourse and the bedspread on the decedent's bed and the sheet

found in the clothes hamper had seminal stains. There were no marks on the body, other than the bruises on the head, to indicate accomplishment of the intercourse by force.

One police officer went to appellant's house about seven o'clock in the morning but got no answer to his knocking and bell-ringing other than the barking of the dog inside the house. Two other police officers, later in the morning, got like results. Appellant responded only after one of the officers reached in the window of the room where he lay and tapped him on the shoulder. His appearance when he opened the door, as described by the officers, does not bear out his story of having been in such a heavy sleep that previous efforts to rouse him had been unavailing.

After being informed of the discovery of his wife's dead body, appellant dressed slowly and meticulously, had a drink, arranged with a neighbor to look after the dog as he feared its barking might disturb the neighborhood, and, accompanied by the two police officers, proceeded to the place where his wife's body lay. There, although no one had suggested his complicity, he denied guilt and, although he did not know of the physical evidences of recent intercourse which were later discovered, said: "I would like to get the son-of-a-bitch that laid her."

The whole chain of circumstances proved by the State, considered in its entirety, is strong and convincing and rebuts the presumption of appellant's innocence. After carefully weighing all the evidence, we believe there is ample proof to support the verdict of murder in the second degree returned by the jury.

The judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For reversal*—None.