911 A.2d 104 (2006)
389 N.J. Super. 97
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff,
v.
A.C. and K.W., Defendants.
Superior Court of New Jersey, Chancery Division, Family Part, Essex County.
Decided April 27, 2006.
*105 Mervin A. Bourne, Jr., Deputy Attorney General, for plaintiff.
Theresa Owens, Assistant Deputy Public Defender, for defendant A.C.
Francesca S. Blanco, for defendant K.W.
Cindy Salsbury, Law Guardian, Office of the Public Defender, for Minor T.W.
RYAN, J.S.C.
The New Jersey Division of Youth and Family Services ("DYFS" or the "Division") has filed a verified complaint and order to show cause ("OTSC") in the Family Part, seeking legal custody of T.W. and O.B. pursuant to N.J.S.A. 9:6-8.1 to -8.73 and N.J.S.A. 30:4C-11 to -14. DYFS's legal authority to bring an emergent application seeking involuntary removal of a child from his or her place of residence is exclusively derived from these two separate statutory schemes. N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J.Super. 245, 258-59, 800 A.2d 132 (App. Div.2002); See also, N.J. Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 185, 644 A.2d 1093 (1994); N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 552, 643 A.2d 987 (1994). In order to determine the "sufficiency of the application," not only for purposes of setting a return date but also more importantly for ordering emergency relief, the court must consider and apply the statutory standards found in both Title 9 and Title 30. See N.J.S.A. 9:6-8.28.

PROCEDURAL HISTORY
The OTSC was filed on November 28, 2005, "for the protection and best interests of the children T.W. (D.O.B. 10/25/05) and O.B. (D.O.B. 1/27/03), and to obtain legal custody." The allegations lodged against the biological parents, A.C. (D.O.B. 3/5/86) and K.W. (D.O.B. 1/13/84), asserted abuse and neglect on the basis that "T.W. sustained a bilateral skull fracture and her injury was not explained by her primary caretakers, A.C. and K.W. Both parents deny any knowledge of a fall or other accidental injury of the infant." A second child, O.B., was reportedly in the care and custody of the natural father, but was not located. The verified complaint disclosed that the father, M.B., is "actively serving in the Ghanaian military."
Predicated on the information incorporated in the verified complaint, the testimony of the DYFS case manager, the Special Response Unit ("SPRU") response summary and the contents of the child's medical examination form, which confirmed the aforementioned diagnosis/significant injuries, the court granted the application to "avoid an ongoing risk to the life, safety and health of the children." *106 Care, custody and supervision were awarded to DYFS, as amended on December 8, 2005 to permit parental visitation at the treating hospital, the University of Medicine and Dentistry of New Jersey ("UMDNJ"). Further, the court granted physical custody to the paternal grandmother, N.T., with the proviso that a home health aide and other relevant services be in place forthwith. Later compliance review hearings resulted in "reasonable efforts" services being ordered, such as parenting skills and essential psychological evaluations. The parents, who resided with N.T., were allowed continuous supervised care of the child within the household.
The fact-finding hearing consumed one day and included the testimony of DYFS supervisor, Susan Stanecki, and the expert testimony of pediatric radiologist, Sosamma T. Methratta, M.D. The documentary evidence tendered and admitted into evidence was marked P1 through P13. The parties stipulated that the radiologist was an expert witness and was, therefore, competent to voice her opinion pursuant to N.J.R.E. 702. The defendants elected to testify on their own behalf, as did the child's grandmother, N.T.

FACTS
T.W. was born to the union of A.C. and K.W., on October 25, 2005, at UMDNJ. The female child and the parents maintained their living quarters in East Orange, New Jersey. Since birth, T.W. had a number of infirmities, including a "hole in her heart," feeding problems and "blood in her stool." Ostensibly, the parents were instructed to be especially vigilant of T.W. and "make sure her fingers and lips do not turn blue."
On November 22, 2005, A.C. had an appointment scheduled in the welfare office at 50 South Clinton Street, East Orange, New Jersey. Prior to her departure, A.C. related that she "gave the baby a bath with a cloth on the bed. She noticed a bump on the baby's head". A.C. explained to Ms. Susan Stanecki, the SPRU investigator, that while in the taxi cab the "baby started to cry." The child was contained in a "carrier.". During trial, A.C. was cross-examined regarding a purported inconsistent statement furnished to East Orange police officer Jermaine Williams at the hospital. According to Officer Williams, A.C. volunteered that "at around 1200 hours while at 50 South Clinton Street her newborn baby began to cry continuously without stopping. She then became worried and began to inspect the baby to investigate why she was crying. She states that while inspecting the baby she noticed that the right side of the baby's head was swollen". In contrast, the defendant's mother explained to Ms. Stanecki that "this is unusual for the baby to cry so much" and that the baby's outburst commenced while the twosome were in the cab.
Seeking guidance, A.C. telephoned N.T., the paternal grandmother, who advised her to "call an ambulance." As to this sequence, she informed Ms. Stanecki "the baby was crying so much that she called N.T. ... who told her to come home and take the baby to the hospital. Upon returning home, EMS was summoned and the baby was transported to Columbus Hospital in Newark."
The admitting physician at Columbus Hospital, Rajesh Kothari, M.D., examined T.W. at about 2:30 p.m. and submitted a seminal diagnosis of "swelling on her right side of head." Although unclear from the hospital documents, either x-rays or a cat scan were performed on the skull (four views). The report concluded:
Multiple views of the skull demonstrate no fracture. Major sutures are open. *107 No bone destruction is evident. Impression: No fracture noticed.
The final results were transcribed and the conclusions disseminated to defendants at 4:25 p.m.
Upon receipt, A.C. testified she "felt something was still wrong with the baby because she was still crying and that was not natural for her. They wanted a second opinion." The Deputy Attorney General suggested an alternative theory, i.e., A.C. knew that the child was injured and the circumstances that led to the injury, which compelled her to admit T.W. at UMDNJ. The University Hospital conducted a cat scan of the head which revealed "bilateral parietal skull fractures, minimally displaced (diastatic)." The DYFS pediatric consultant, Raksha Gajarawala, M.D., F.A.A.P., detailed her findings in her December 7, 2005, communication to DYFS and observed:
The presence of soft tissue swelling on the scalp, but no intracranial hemorrhage. A skeletal survey also reviewed revealed diastatic fractures of the parietal bone. The fracture line extends towards the mid-line. The fracture edges are separated approximately 2 mm.
Dr. Gajarawala's comprehensive submission to DYFS included the sources and materials utilized to reach her final diagnosis and conclusions. In the end, the pediatrician declares "with reasonable degree of certainty that the history given is not consistent with the injuries." To underscore her conclusions, she makes two probative comments:
(1) the one month old infant . . . has suffered from bilateral diastatic parietal skull fractures for which we do not have any explanation as to how the injury occurred; and (2) bilateral skull fractures that are continuous across the mid-line can result from a single unilateral impact. Symmetric features may also occasionally occur as a result of an impact in the midsagital skull or cranial vertex. A single high force impact, particularly when applied along the mid-line, may transfer sufficient energy to cause diastatic fractures.
Other narratives in the medical composition are enlightening. For example, the "parents were inquired (sic) about any history of fall, injury or accidental banging of the head anywhere or if the baby was dropped off to the floor, etc. The parents deny any injury of the baby at all." The hospital documents include a statement that there was "no swelling on the head" at birth and "no swelling of the head was reported" when the infant was seen three times in the hospital prior to this admission, twice by a cardiologist and one for milk allergy. Dr. Gajarawala also detects the inconsistent statement offered by A.C. regarding when she noticed the swelling and the lack of veracity regarding A.C.'s three year old son, O.B.
Earlier investigation by the SPRU, headed by Ms. Susan Stanecki, uncovered information that O.B. did not reside with his natural father as claimed by A.C., but rather with the maternal grandfather, J.C., in Orange, New Jersey. Indeed, upon ascertaining his whereabouts, the grandfather divulged that "O.B. has always lived with him and never with his father." J.C. said that the father never lived in the USA, and is in the military in Ghana. J.C. remarked that "O.B. is presently in Jamaica with his aunt, but he could be returned to the USA at the Division's request."
At the fact-finding hearing, the pediatrician and radiologist referenced in Dr. Gajarawala's synopsis, Sosamma T. Methratta, M.D., testified and essentially reiterated the facts and conclusions memorialized by her colleague. More specifically, the radiologist recreated in open court a drawing, which vividly reflected *108 the extent, nature and effect of the injury while concurring with the probable cause of the injurythe head having a high impact with a solid or firm surface.
A.C., K.W. and N.T. all testified for the defense and disclaimed any knowledge of how the injury occurred. The testimony did highlight, however, that the defendants were attentive to the needs of the child and had no prior contact with DYFS. Ample evidence was produced which indicates that they maintained their scheduled appointments with the treating physicians at UMDNJ, while administering to the child as prescribed by the medical personnel.

LEGAL ARGUMENT
A judge may not enter an order directing the temporary removal of a child without a hearing, absent a specific finding that three statutory conditions have been met. N.J.S.A. 9:6-8.28 requires the judge to be satisfied by a preponderance of the evidence, and guided by the overriding principle that "the safety of the child shall be of paramount concern" that:
1) the parent or other person legally responsible for the child's care is absent or, though present, was asked and refused to consent to the temporary removal of the child and was informed of an intent to apply any order applicable under this section of the statute;
2) the child appears so to suffer from abuse or neglect of his parent or guardian that his immediate removal is necessary to avoid imminent danger to the child's life, safety or health;
3) there is not enough time to hold a preliminary hearing.
N.J. Div. of Youth & Family Servs. v. J.Y., supra, 352 N.J.Super. at 259-60, 800 A.2d 132. These findings must be made on the record and supported by specific reference to the evidence relied upon by the judge. Such evidence may include, but is not limited to, police reports or other law enforcement records, hospital records, school records or other professional reports containing information relevant to the child's health and safety or the parent's fitness or whereabouts. R. 5:12-4(d). The judge may also consider the testimony, under oath, of a DYFS representative who can attest to the efforts undertaken to determine whether the above cited statutory requirements have been met. Although such testimony may include hearsay statements, the judge must be satisfied that the evidence adduced provides a sufficiently reliable basis upon which to make the requisite findings. Ibid.; N.J.S.A. 9:6-8.46.
The New Jersey Legislature has enacted two "separate and distinct" statutes to protect children from abuse and neglect and to provide for the termination of parental rights. N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 558, 643 A.2d 987 (1994). Title Nine governs the adjudication of abuse and neglect cases, while Title Thirty sets forth the procedures for the permanent removal of children from their parents. See, N.J. Div. of Youth & Family Servs. v. E.B., supra, 137 N.J. at 185, 644 A.2d 1093. The express purpose of Title Nine is to:
provide for the protection of children less than 18 years of age who have had serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected. [N.J.S.A. 9:6-8.8.]
Because child abuse and neglect are often difficult to detect, Title Nine provides *109 that "any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse" must inform DYFS immediately. N.J.S.A. 9:6-8.10. The Division is required to investigate the allegations, N.J.S.A. 9:6-8.11, -8.18; N.J.S.A. 30:4C-11, -12, and to take appropriate action to safeguard the child or children from further injury. N.J.S.A. 9:6-8.8-8.11, -8.18. When warranted by the circumstances, DYFS may seek an order from the court placing the child in the protective custody of the State. N.J.S.A. 9:6-8.18; State v. P.Z., 152 N.J. 86, 96-97, 703 A.2d 901 (1997).
The inquiry in every case focuses on the best interest of the child. At the same time, the goal of family rehabilitation and reunificationthe return of the child to the familyis a priority "unless that goal is not in the best interests of the child." N.J.S.A. 30:4C-60. The goal recognizes both the value to children of being restored to their families when possible, and the rights of parents to be with and to raise their children. See In re Guardianship of J.C., 129 N.J. 1, 7-8, 608 A.2d 1312 (1992); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599-600, 512 A.2d 438 (1986). The abused child's interest is paramount; only when the child can be protected within the family will the parents' interest in the care and custody of their child also be realized. State v. P.Z., supra, 152 N.J. at 99-100, 703 A.2d 901.
Parents have a fundamental constitutional right to raise their children. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972); N.J. Div. of Youth & Family Servs. v. A.W., supra, 103 N.J. at 599, 512 A.2d 438. However, the constitutional protection surrounding family rights is tempered by the State's parens patriae responsibility to protect the welfare of children. Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979); In re Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999). Thus, in order to relieve the tension created by these potentially disparate constitutional principles, the court's authority to remove children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards. N.J. Div. of Youth & Family Servs. v. J.Y., supra, 352 N.J.Super. at 261, 800 A.2d 132.
These safeguards are designed to serve dual salutary functions: to protect innocent parents against precipitous governmental intrusion or interference with their fundamental right to the parental relationship and to spare the children the emotional trauma resulting from an unwarranted separation from their parents. The twin pillars upon which the statute rests are: (1) that no child shall be exposed to the dangers of abuse or neglect at the hands of their parent or guardian; and, commensurately, (2) that no parent should lose custody of his/her child without just cause. Id. at 265, 800 A.2d 132; N.J. Div. of Youth & Family Servs. v. H.B., 375 N.J.Super. 148, 175, 866 A.2d 1053 (App.Div.2005). The law governing DYFS reflects a strong societal bent in favor of the integrity of the natural family. The law clearly favors keeping children with their natural parents and resolving care and custody problems within the family. When children are placed in foster care, the law requires diligent efforts by the State to maintain a relationship between children and their parents and to return children home as quickly as possible. In re Guardianship of J.C., supra, 129 N.J. at 7-8, 608 A.2d 1312.
DYFS must establish at a fact-finding hearing, by a preponderance of the evidence, that the baby was an abused or neglected child. N.J.S.A. 9:6-8.44; N.J.S.A. 9:6-8.46(b). The fact-finding process *110 under the Act is a significant and necessary check on DYFS's actions. Its focus centers upon the question of whether the parent under consideration caused injury to the child and, if not, whether the parent is likely to do so in the future. N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J.Super. 13, 23-23, 855 A.2d 8 (App. Div.2004), certif. denied, 182 N.J. 426, 866 A.2d 983 (2005).
The court's role in the fact-finding process has been carefully prescribed by the Legislature in a series of specific statutory provisions. The consistent legislative concern running through the entire statutory scheme is "the safety of the children" as a "paramount concern." The judge's determination that a child has been abused or neglected "has a profound impact on the lives of families embroiled in this type of crisis". Factual findings, therefore, must be based upon the preponderance of the evidence standard and "only competent, material and relevant evidence may be admitted". N.J.S.A. 9:6-8.46(b); N.J. Div. of Youth & Family Servs. v. J.Y., supra, 352 N.J.Super. at 262, 800 A.2d 132; N.J. Div. of Youth & Family Servs. v. H.B., supra, 375 N.J.Super. at 175, 866 A.2d 1053.
The criteria for sustaining or dismissing a complaint of abuse and neglect are delineated in N.J.S.A. 9:6-8.50.
(a) If facts sufficient to sustain the complaint are established . . . the court shall, subject to the provisions of subsection (c) hereof, enter an order finding that the child is an abused or neglected child and shall state the grounds for specific findings.
(b) If the proof does not conform to the specific allegations of the complaint, the court may amend the allegations to conform to the proof; provided, however, that in such case the respondent (parent or guardian) shall be given reasonable time to prepare to answer the amended allegations.
(c) If facts sufficient to sustain the complaint under this act are not established, or the court concludes that its assistance is not required on the record before it, the court shall dismiss the complaint and shall state the grounds for the dismissal.
(d) If the court makes a finding of abuse or neglect, it shall determine, based upon the facts adduced during the fact-finding hearing, and upon any other facts presented to it, whether a preliminary order pursuant to N.J.S.A. 9:6-8.31 is required to protect the child's interests pending a final order of disposition. The court shall state the grounds of its determination. In addition, a child found to be abused or neglected may be removed and remanded to a place designated by the court or be placed in the custody of a suitable person, pending a final order of disposition, if the court finds that there is substantial probability that the final order of disposition will be an order of placement under N.J.S.A. 9:6-8.54.
[N.J.Div. of Youth & Family Servs. v. J.Y., supra., at 262-63, 800 A.2d 132]
An "abused or neglected child" is defined, in pertinent part, as follows: "abused or neglected child" means a child less than 18 years of age whose parent or guardian, as herein defined:
. . . .
(4) . . . a child whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care.
. . . .

*111 (b) in providing the child with proper supervision . . . by unreasonably inflicting or allowing the inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
[N.J.S.A. 9:6-8.21(c)(4)(b); N.J. Div. of Youth & Family Servs. v. R.W., 273 N.J.Super. 365, 370, 641 A.2d 1124 (Ch. Div.1994).]
Children are uniquely circumstanced. They are by their very nature helpless beings who depend entirely upon their parents for nourishment, care and emotional security. Enactments such as N.J.S.A. 30:4C-12 are designed as measures for their protection when the parents fail in that task or when it is reasonably feared that they have done so. Such is the underlying rationale for the investigative duty imposed upon DYFS. N.J. Div. of Youth & Family Servs. v. Wunnenburg, 167 N.J.Super. 578, 586-87, 408 A.2d 1345 (App.Div.1979). Is it reasonable or unreasonable for DYFS to seek care and custody based upon the evidence set forth in the case sub judice?
The quantum and quality of the evidence that has been tendered by the State includes irrefutable proofs that T.W. sustained a "bilateral parietal skull fracture" which is also described in medical jargon as a "diastatic skull fracture." The evidence further indicates that the child was exclusively in the care and custody of the female parent A.C., when the injury probably occurred. Concededly, the exact time of the injury was not, and apparently cannot, be precisely pinpointed. The remaining body of facts published to the court, as the trier of the facts, was testimonial and documentative and can be generally characterized as circumstantial in nature. Neither parent accepts responsibility for the harm inflicted on the child, nor have either offered an explanation. In short, A.C. and K.W. simply state, "I don't know what happened."
It is difficult to marshal direct evidence of parental abuse and neglect because of the closed environment in which the abuse most often occurs and the limited ability of the abused child to inculpate the abuser. Consequently, in In re D.T., 229 N.J.Super. 509, 517, 552 A.2d 189 (App.Div.1988), the court held that when a limited number of persons have access to or custody of an infant during the period when an abuse concededly occurs, the burden shifts to those persons to come forward and provide evidence to establish their non-culpability for that abuse. N.J. Div. of Youth & Family Servs. v. S.S. 275 N.J.Super. 173, 179, 645 A.2d 1213 (App.Div.1994).
The Appellate Division cited two New York cases in S.S., supra, In the Matter of Young, 50 Misc.2d 271, 270 N.Y.S.2d 250, 253 (Fam.Ct.1966) and In the Matter of Roman, 94 Misc.2d 796, 405 N.Y.S.2d 899 (Fam.Ct.1978) and wrote: "We found these decisions persuasive in both their analyses and conclusions." N.J. Div. of Youth & Family Servs. v. S.S., supra, 275 N.J.Super. at 181, 645 A.2d 1213. In referring to In the Matter of Young, the court held that "once the petitioner has established the existence of injuries sustained by the child which are substantial in character while the child was in the lawful custody of his parents or other persons legally responsible for his care, the petitioner is deemed to have established a prima facie case and the burden of coming forward shifts from the petitioner to the respondent who is then required to offer a satisfactory explanation concerning the injuries." Id. at 180, 645 A.2d 1213 (citing In re the Matter of Young, supra, 270 N.Y.S.2d at 253). This is also a case in which the conclusions drawn from the facts *112 contained in the DYFS staff reports constitute prima facie evidence subject to rebuttal, R. 5:12-4(d), and the burden has shifted to the respondents to rebut the prima facie case of abuse.
Assuming arguendo that the injury was accidental, it is generally recognized, in some circumstances, that non-intentional conduct is sufficient to warrant a finding of abuse if injury to the child is demonstrated. G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 175-82, 723 A.2d 612 (1999) (holding that conduct causing unintended injuries can form the basis for finding of child abuse, and that absence of a minimum degree of care can be found when the guardian is aware of dangers to a child inherent in a situation, yet acts in reckless disregard for those dangers). It is also recognized that the court "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383, 736 A.2d 1261 (1999). However, as a part of its burden of proof, the State must still demonstrate by a preponderance of the competent, material and relevant evidence (N.J.S.A. 9:6-8.46(b)), the probability of present or future harm. N.J. Div. of Youth & Family Servs. v. S.S., supra, 372 N.J.Super. at 24, 855 A.2d 8.
Having decided that N.J.S.A. 9:6-8.21(c)(4) can apply to some accidentally-caused injuries, the next question is what standard of care is applied to the phrase "failure to exercise a minimum degree of care." "The phrase `minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., supra, 157 N.J. at 177-78, 723 A.2d 612 (citing Miller v. Newsweek, 660 F.Supp. 852, 858-59 (D.Del.1987))
Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result. McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305, 266 A.2d 284 (1970). Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful. Ibid.; Egan v. Erie Railroad Co. 29 N.J. 243, 254-55, 148 A.2d 830 (1959). So long as the act or omission that causes injury is done intentionally, whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant. McLaughlin, supra, 56 N.J. at 305, 266 A.2d 284. Knowledge will be imputed to the defendant. G.S., supra, 157 N.J. at 178, 723 A.2d 612. Although it is clear that the phrase implies more than simple negligence, it can apply to situations ranging from "slight inadvertence to malicious purpose to inflict injury." McLaughlin, supra, 56 N.J. at 305, 266 A.2d 284; G.S., supra, 157 N.J. at 178-79, 723 A.2d 612.
Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others. McLaughlin, supra, 56 N.J. at 305, 266 A.2d 284. Where an ordinary, reasonable person would understand that a situation poses risks and acts without regard for the potentially serious consequences, the law holds her responsible for the injuries she causes. Ibid. Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of her actions, regardless of whether she actually intended to cause injury. Accordingly, the court in G.S. held that a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious *113 injury to that child. G.S., supra, 157 N.J. at 179, 181, 723 A.2d 612. An obvious illustration would be the "dropping" of an infant due to one's failure to secure or grasp the infant appropriately.
Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation. A variety of factual scenarios can give rise to the finding that a guardian has failed to exercise a minimum degree of care. Thus, the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger. When a reasonable precaution by the guardian would have prevented a child from having his or her physical, mental or emotional condition impaired, that guardian may have failed to exercise a minimum degree of care as a matter of law. The courts must determine, on a case-by-case basis, whether a care-giver has failed to exercise a minimum degree of care in protecting a child. G.S., supra, 157 N.J. at 181-82, 723 A.2d 612.
To be sure, the evidence presented by the Division was wholly circumstantial, apart from the facts related to the sustained injury. There was no direct testimony establishing exactly what A.C. did or omitted to do to cause T.W.'s skull fracture. The evidence of her alleged grossly or wantonly negligent behavior is entirely circumstantial.
It has long been recognized that not all facts need to be proved by direct evidence. State v. Franklin, 52 N.J. 386, 406, 245 A.2d 356 (1968); State v. Siciliano, 21 N.J. 249, 259, 121 A.2d 490 (1956). Circumstantial evidence may be "more certain, satisfying and persuasive than direct evidence." State v. Dancyger, 29 N.J. 76, 84, 148 A.2d 155, cert. denied, 360 U.S. 903, 79 S.Ct. 1286, 3 L.Ed.2d 1255 (1959) (quoting State v. Donohue, 2 N.J. 381, 389, 67 A.2d 152 (1949)). The process of all evidence "is an inference from one fact to the existence of another." State v. Mucci, 25 N.J. 423, 431, 136 A.2d 761 (1957). "Evidence is always a relative term; it signifies a relation between two facts, the `factum probandum, or proposition to be established, and the `factum probans,' or material evidencing the proposition; all evidence must involve an inference from some fact to the proposition to be proved." Ibid. The rational essence of an inference is the "reasonable probability of the identify and authenticity of something deduced from its conformity or repugnancy to our general knowledge, common observation and experience." Davidson v. Fornicola, 38 N.J.Super. 365, 378, 118 A.2d 838 (App. Div.1955), certif. denied, 20 N.J. 467, 120 A.2d 275 (1956). An inference attains practical utility where the "existence of one established fact rationally and logically in light of common experiences warrants the belief of the existence of some other fact." Ibid.; See State v. Humphreys, 54 N.J. 406, 415, 255 A.2d 273 (1969); State v. DiRienzo, 53 N.J. 360, 376, 251 A.2d 99 (1969); State v. Thomas, 256 N.J.Super. 563, 570-71, 607 A.2d 997 (App.Div.1992), aff'd, 132 N.J. 247, 624 A.2d 975 (1993).
Indeed, the rule is well-settled that a "conviction may be had on circumstantial evidence alone provided the evidence is so clear and strong as to convince the trier of the facts, beyond a reasonable doubt [here by a preponderance of the evidence] of the guilt of an accused." State v. Donohue, supra, 2 N.J. at 381, 67 A.2d 152; State v. Bozeyowski, 77 N.J.Super. 49, 56, 185 A.2d 393 (App.Div.1962), cert. denied, Bozeyowski v. New Jersey, 374 U.S. 851, 83 S.Ct. 1916, 10 L.Ed.2d, 1071 (1963).
By way of analogous reasoning, the United States Supreme Court in the case *114 of Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), furnishes valuable guidance. The case centered on alleged sex discrimination by an employee under the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e. Title VII's silence with respect to the type of evidence required in mixed-motive cases also suggests that we should not depart from the conventional rule of civil litigation that generally applies in Title VII cases. That rule requires a plaintiff to prove his case "by a preponderance of the evidence," using "direct or circumstantial evidence." U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714, n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). The utility of circumstantial evidence in discrimination cases is often acknowledged. For instance, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of circumstantial evidence that is probative of intentional discrimination." Ibid.
The adequacy of circumstantial evidence also extends beyond civil cases; courts have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required. See Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150, (1954) (observing that, in criminal cases, circumstantial evidence is "intrinsically no different from testimonial evidence"). And juries are routinely instructed that "the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence." 1A K. O'Malley, J. Genig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed. 2000). Desert Palace, Inc., supra, 539 U.S. at 100, 123 S.Ct. at 2154, 156 L.Ed.2d at 95; see also Model Jury Charge (Civil), 1.12, "General Provision and Outline for Standard Charge" (1998).
To acknowledge that T.W. was in her sole care, sustained a significant (and perhaps life threatening) injury in the form of a skull fracture and yet disclaim any knowledge of the cause of same, defies common sense. Additionally, A.C.'s testimony and the DYFS records clearly demonstrate that A.C. offered prior inconsistent statements that unquestionably impeach her credibility under N.J.R.E. 613(b), 803(a)(1) and 607. Where a party witness in a civil case has admitted making the inconsistent statements, as A.C. has here, placing the statement (or extrinsic proof of same) into evidence is permissible. See Miller v. Henderson, 41 N.J.Super. 15, 124 A.2d 23 (App.Div.), certif. denied, 22 N.J. 229, 125 A.2d 441 (1956). Such a statement would invariably be admissible as substantive as well as impeaching evidence, or it would most probably qualify as an admission or declaration against interest under 803(b)(1) and 803(c)(25). Biunno, Current N.J. Rules of Evidence, Comment 2 to N.J.R.E. 613(b) (2005). In this instance, A.C.'s most prominent prior inconsistent statements(1) the whereabouts and custody of her older child, O.B.; (2) the timing of the discovery of the swelling of the head, and (3) the time span of the children's crying were not admissions, but rather transparent, self-serving attempts to portray herself in the most favorable light to the DYFS investigator and the court. Needless to say, such statements were apparently uttered to divert the Division from the truth. Accordingly, the court elects to admit the prior inconsistent statements for credibility purposes only. See N.J.R.E. 105.
The court concludes, bottomed on the direct and circumstantial evidence introduced during trial, that the Division has *115 proven by a preponderance of the evidence that T.W. was a neglected child within the ambit of N.J.S.A. 9:6-8.21(c)(4) and further, that the culpable party is the biological mother, A.C. This determination is based on the court's finding that A.C.'s assertion of ignorance as to the injury is not credible. The absence of an explanation is "unworthy of credence" and, therefore, is "one form of circumstantial evidence that is probative" of neglect. Moreover, the court in applying the universal factors utilized to determine credibility, i.e., the reasonableness or unreasonableness of testimony, and so forth, is led inexorably to conclude that A.C. is plainly not believable. Simply put, the defendant, A.C., has not rebutted the Division's prima facie case, R. 5:12-4(d), while the Division has clearly satisfied its burden of proof by a preponderance of the evidence.
A finding of neglect will be entered on the record against A.C., the defendant natural mother, and a dispositional hearing pursuant to N.J.S.A. 9:6-8.45 shall be conducted on May 1, 2006 (1:30 p.m.).