# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0063-24

J.L.,[1]

    Plaintiff-Respondent,

v.

F.F.-A.,

    Defendant-Appellant.

_____

        Submitted October 15, 2025 – Decided November 3, 2025

        Before Judges Firko and Perez Friscia.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1636-24.

        F.F.-A., appellant pro se.

        Geraldene Sherr Duswalt, attorney for respondent.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

Defendant F.F.-A., a self-represented litigant, appeals from the April 18, 2024 final restraining order (FRO)[2] entered against him under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, and in favor of plaintiff J.L. Defendant also appeals from the May 10, 2024 order requiring him to pay plaintiff's attorney's fees. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

The parties were married in December 2017 and later had twins, born in January 2019. The parties divorced in April 2022. After the divorce, they each filed multiple post-judgment motions in Middlesex County. On January 20, 2024, plaintiff obtained a temporary restraining order (TRO) after filing a domestic violence complaint in Union County, alleging defendant committed the predicate act of harassment. The same day, defendant was served a copy of the TRO. Plaintiff later amended her TRO on January 22. On January 24, defendant obtained a TRO in Middlesex County, alleging plaintiff committed the predicate act of harassment. Defendant amended his TRO on February 1.

---

[2] We note the court later entered an amended FRO that defendant did not appeal from, which became the operative order. We refer at times to the "FROs" throughout this opinion to make clear our conclusions apply to both the April 18, 2024 FRO and the amended FRO.

A-0063-24

On January 31, 2024, plaintiff's Union County TRO was transferred to Middlesex County and issued a new docket number. Plaintiff obtained a second amended TRO on February 12. The same court that handled the parties' divorce and post-judgment motions also presided over the parties' trial on the cross-TROs on March 25 and April 11.[3]

As defendant's TRO was docketed in Middlesex County before plaintiff's transferred TRO was docketed, defendant proceeded first on his TRO and testified at trial. Defendant alleged plaintiff committed the predicate act of harassment because in the beginning of January 2024, during his parenting time week, plaintiff called him thirty-three times. He testified he "never picked up any of the[] calls" because there was a consent order requiring the parties to "communicate via e-mail" or "text messages."

Defendant also testified that plaintiff attempted to intimidate him by obtaining a TRO. He testified that plaintiff purposely obtained an amended TRO to interfere with the provisions of his TRO.

Defendant believed the twins were suffering from "traumatic stress" because the parties were conducting their parenting exchanges at police stations

---

[3] Defendant failed to provide the trial transcript for April 11. At our request, defendant submitted the transcript on September 24, 2025.

A-0063-24

and "the kids were experiencing . . . matters that deal with race." Defendant is a Black man, and plaintiff is a White woman. Based on his concerns for the children and desire for a better parenting exchange location, defendant "texted" plaintiff on January 20, 2024, and advised he would not go to the police station for the parenting exchange. He messaged plaintiff that he was at her residence "to pick up the kids." A short time later, defendant called the police because plaintiff's boyfriend had "attack[ed]" him. Defendant observed plaintiff arrive at her residence with the twins. After plaintiff allegedly saw defendant, she "attempt[ed] to go back in her car" but thereafter "grabbed the children and went inside her house." After the police arrived and did a "welfare check," defendant left without the children. He maintained that his recitation of the events and the short video he played for the court, were "pretty much" all that happened.

Regarding plaintiff's prior acts, defendant testified that she would drive her vehicle with the children to his complex and would "park in somebody[ else's] parking spot." After he asked plaintiff to "drop the[ twins] off in front of [his] building," she "refused" his request. Defendant testified that during a September 2023 incident, plaintiff parked in another resident's parking spot to facilitate the parenting exchange and her boyfriend "taunt[ed]" him. Defendant explained that the parties would videotape the parenting exchanges. He also

referenced multiple incidents in 2022 and 2023, including occasions when plaintiff tried to change parenting time arrangements, her boyfriend attended and chastised defendant, and she sent "menacing texts" when the parties were arranging parenting "exchanges."

Plaintiff testified that on January 20, 2024, pursuant to a post-matrimonial court order, she went with her children to the Cranford police station to meet defendant for their scheduled exchange. Plaintiff waited from 10:00 a.m. to 10:30 a.m., but defendant did not appear. The parties exchanged text messages in which defendant relayed he would not do the exchange at the police station. Plaintiff wanted to continue the exchanges at the police station because of "all . . . the conflicts" they were having.

After defendant failed to appear at the station, plaintiff returned to her residence. Plaintiff testified that defendant confronted her as she tried to enter her residence with the twins. He blocked plaintiff from entering "the door to [her] building" and "started yelling and chasing" them. She attempted to return to her vehicle and the police station to exchange the twins, but defendant interceded. Plaintiff testified that defendant chased her around the parking lot on foot, grabbed her cell phone from her hand, pushed her, "was angry and aggressive," and tried to pull one of the twins from her arms. Plaintiff expressed

5

feeling "very scared."

Regarding the September 2023 incident, plaintiff testified that she had parked in a visitor's parking spot in defendant's complex and brought the children to defendant's door, but he was not there. She went back to her vehicle, which her boyfriend was waiting in, and realized defendant was waiting at the car. Defendant started "yelling," "cursing" and calling her "[t]he F-word" and "stupid." After exchanging the children, defendant "stood in the middle of the parking lot" and "block[ed] [plaintiff from] leaving the complex."

Plaintiff also testified to a prior incident that occurred on August 16, 2022. Defendant was allegedly "[v]ery angry and aggressive" when he parked behind plaintiff and blocked her vehicle so he could yell at her. She explained defendant attempted to shove her "out of the way in order to . . . yank the kids out of the car." On plaintiff's introduced video of the incident, defendant stated, "[g]et the f[*]ck away from me" and "[y]ou let me have him." Plaintiff offered another video taken on the same day and defendant stated, "F[*]ck you, bitch. F[*]ck you . . . F[*]ck you."

Regarding defendant's alleged receipt of thirty-three phone calls from plaintiff during early January 2024, she asserted that a review of her phone records for the week only showed eighteen phone calls. She explained her phone

6

calls were during the evenings that defendant had the twins and she wanted to check on the children, say goodnight to them, and "coordinate where [she] would be able to get the kids back." She also relayed that on Father's Day in 2023 defendant confronted her and her boyfriend after they thought he had left with the twins. Defendant left the children unattended to confront them.

Plaintiff refuted defendant's accounts of other incidents in 2022 and maintained defendant was the aggressor. She explained that after defendant brought to her attention the issue regarding where she parked, she "tried to park in the visitors['] spots." Plaintiff also testified to prior incidents and played videos depicting defendant yelling and cursing at her and her boyfriend.

Further, she testified that in October 2021 while the parties were still married and the children were two years old, defendant locked the twins "in their room" and "blocked [her] from entering" the room to console them. The incident lasted longer than an hour and she eventually called the police. She asserted in January 2019, when the twins were newborns, defendant locked her in a room with them "for three hours." She relayed feeling "unsafe" living with defendant, which caused her to move out and live with her family.

Regarding her need for protection, plaintiff testified that she "want[s] to be safe" and not "be scared." She conveyed her continued sense of fear, because

7

A-0063-24

she worried "about him showing up somewhere or yelling or harassing or cursing at . . . or shoving" her. Further, she believed "[their] interactions have been unpredictable."

Plaintiff's boyfriend testified that on January 20, 2024 he heard noises from outside of plaintiff's apartment. After going downstairs and exiting the lobby, he opened the door and observed defendant "screaming" and "running after" plaintiff. Defendant was "cursing," "irate," and "aggressive." He could see plaintiff was "scared" and the twins were "frantic." Plaintiff's boyfriend testified that on Father's Day 2023 he also witnessed defendant yelling and cursing. Defendant had threatened him while the children were "running down the street unsupervised."

Defendant testified again in rebuttal that he was never "physical" with plaintiff and never shoved his "way into [her] car." He generally denied plaintiff's allegations and expressed that the videos that were in evidence showed he was "really frustrated."

On April 18, the court issued an order accompanied by a thirty-one-page oral decision that denied defendant an FRO and dismissed his complaint. The court issued plaintiff an FRO against defendant. Regarding defendant's FRO,

A-0063-24

the court found he failed to prove plaintiff committed harassment.[4]  The court found plaintiff established defendant committed the predicate act of harassment, pursuant to N.J.S.A. 2C:33-4(b) and (c), and she required an FRO for her protection from defendant.  In making its findings, the court provided a detailed account of the evidence considered.

The court found plaintiff "testified . . . in a very credible way," noting "[s]he always appeared to be calm and collected."  Additionally, the court found that plaintiff's boyfriend was "very credible" and a "real gentleman," noting that "[h]e was soft spoken" and "measured."  It found defendant "lacked credibility" as demonstrated by his failure to answer questions and his "evasive[ness]."  The court had to "intercede" and direct defendant multiple times to answer the question posed.

Regarding plaintiff's asserted predicate act of harassment committed by defendant on January 20, 2024, the court stated, "I have no doubt [about] what occurred with the pushing and the shoving and the aggressiveness with taking the phone, . . . I think [plaintiff] . . . has every right to feel afraid."  The court also found plaintiff's specific recitation of prior domestic violence incidents was credible and noted "I think these things are frightening encounters."

---

[4] Defendant does not challenge the dismissal of his complaint.

Referencing the multiple videos the parties moved into evidence, the court found plaintiff showed a recurring pattern of harassment and noted the incidents were "ugly and . . . horrible." The court also found plaintiff established a need for protection from future acts of domestic violence based on defendant's harassment and the parties' prior history. It reasoned that the parenting exchange videos demonstrated that "defendant present[ed] on the scene and explode[d]," and an FRO was warranted because plaintiff feared defendant and was "really scared."

After the court's decision, plaintiff requested attorney's fees pursuant to N.J.SA. 2C:25-29(b)(4) and Rule 4:42-9. The parties' attorneys agreed to the court's imposed submission schedule, providing plaintiff's counsel ten days to file a certification of services with the requisite documentation and defendant's counsel ten days thereafter for opposition. On April 19, the court entered an amended FRO memorializing the filing deadlines and requiring the parties to communicate on "Our Family Wizard"[5] for "all matters pertaining to [the] children."

In support of plaintiff's attorney's fee application, plaintiff's counsel

---

[5] "Our Family Wizard" is a co-parenting application that allows parents to share messages, calendars, and documents concerning their children.

A-0063-24

submitted an affidavit of services, delineating the trial work she performed and "addressing the factors enumerated by [Rule of Professional Conduct (RPC)] 1.5(a)" pursuant to Rule 4:42-9(b), which defendant's counsel opposed. On May 10, the court entered an order accompanied by a one-page statement of reasons, awarding plaintiff $5,044.50 in attorney's fees. Under RPC 1.5(a), the court found plaintiff's attorney's fees were reasonable because:

> Plaintiff's attorney expended a significant amount of time (17.7) hours on th[e] case. Time spent on th[e] case would naturally preclude counsel from [accepting] other employment. Plaintiff's counsel devotes her practice exclusively to handling family matters, routinely involved with [continuing legal education] courses and is active in family law bar associations. Her hourly rate of $285 is certainly in line with an attorney with her background in [Middlesex] County and in this area of the law.

Further, the court found that plaintiff's attorney's fees "relate[d] to her preparation to the trial of this matter and to addressing matters and issues preceding the trial" and that plaintiff "would not have incurred th[e] fees if [d]efendant had not committed an act of domestic violence."

On appeal, defendant argues the court: erred in issuing the FRO without affording him due process; abused its discretion in denying him access to critical evidence; improperly awarded plaintiff attorney's fees, violating his due process rights; committed cumulative errors, requiring reversal of the FRO; and should

11

have expunged the FRO to prevent further prejudice to him.

## II.

"We accord substantial deference to Family Part judges, who routinely hear domestic violence cases . . . ." C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). When reviewing "a trial court's order entered following [a] trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). We do "not disturb the factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." C.C., 463 N.J. Super. at 428 (first alteration in original) (quoting S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010)) (internal quotation marks omitted).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare

A-0063-24

v. Cesare, 154 N.J. 394, 412 (1998)); see also D.M.R. v. M.K.G., 467 N.J. Super. 308, 323 (App. Div. 2021) ("Since this case turned almost exclusively on the testimony of the witnesses, we defer to the Family Part judge's credibility findings, as he had the opportunity to listen to the witnesses and observe their demeanor."). We nonetheless review de novo a trial judge's legal conclusions. M.A. v. J.H.M., 260 N.J. 522, 532 (2025).

The New Jersey Legislature enacted the PDVA "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. The PDVA defines a "[v]ictim of domestic violence" as "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d); R.G. v. R.G., 449 N.J. Super. 208, 219-20 (App. Div. 2017) (recognizing the amended definition of "[v]ictim of domestic violence" evinced "the Legislature's intent to broaden the application" of the PDVA).

The entry of an FRO under the PDVA requires the trial judge to make certain findings pursuant to a two-step analysis delineated in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a)

has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). The judge is also required to consider "any past history of abuse by a defendant as part of a plaintiff's individual circumstances and, in turn, factor that history into its reasonable person determination." Cesare, 154 N.J. at 403. "'A single act can constitute domestic violence for the purpose of the issuance of an FRO,' even without a history of domestic violence." C.C., 463 N.J. Super. at 434-35 (quoting McGowan v. O'Rourke, 391 N.J. Super. 502, 506 (App. Div. 2007)).

Second, if a predicate act is proven, the judge must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further acts of abuse. Silver, 387 N.J. Super. at 127. A previous history of domestic violence between the parties is one of six non-exhaustive factors a court is to consider in evaluating whether a restraining order is necessary to protect the plaintiff. N.J.S.A. 2C:25-29(a)(1); see also D.M.R., 467 N.J. Super. at 324-25 (holding whether a judge should issue a restraining order depends, in part, on the parties' history of domestic violence).

Harassment, N.J.S.A. 2C:33-4, is a predicate act of domestic violence enumerated under the PDVA. N.J.S.A. 2C:25-19(a)(13). Under N.J.S.A. 2C:33-4(b), a person commits harassment "if, with purpose to harass another, he [or she] . . . [s]ubjects another to striking, kicking, shoving, or another offensive

14

touching, or threatens to do so." Further, a person commits an act of harassment "if, with purpose to harass another, he[ or she] . . . [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c).

To commit harassment, a defendant must "act with the purpose of harassing the victim." D.M.R., 467 N.J. Super. at 323. "'A finding of . . . purpose to harass may be inferred from the evidence presented' and from common sense and experience." Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)). "Although a purpose to harass can be inferred from a history between the parties, . . . that finding must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D. v. M.D.F., 207 N.J. 458, 487 (2011). A judge must consider "the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S., 175 N.J. at 326 (quoting Cesare, 154 N.J. at 404).

## III.

We begin our analysis by noting defendant's failure to comply with applicable court rules, which inhibited a review of the full trial record and specific facts relied on by the court in its opinion. Defendant's merits brief

15

references trial evidence, including videos, communications, and reports, not provided on appeal. R. 2:6-1(a)(1)(I) (The appendix must contain parts of the record "essential to the proper consideration of the issues"). Because the full record is essential to our determination of issues raised on appeal, we are not "obliged to attempt review of an issue when the relevant portions of the [trial court] record are not included." Cmty. Hosp. Grp. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C., 381 N.J. Super. 119, 127 (App. Div. 2005). However, while defendant failed to provide the full trial record, we have nevertheless reviewed the domestic violence record provided on appeal and considered all of defendant's arguments.

Defendant argues the court violated his due process rights in issuing the FRO because plaintiff's complaint was improperly transferred "from Union County to Middlesex County without formal orders."[6] Defendant fails to acknowledge that the parties litigated their divorce and post-judgment matters in Middlesex County. Relevantly, defendant had filed his related TRO in Middlesex County and plaintiff's cross-TRO was consolidated with his action. Further, at the time the parties filed their cross-TRO's, there was a pending post-

---

[6] While defendant referenced that he received an email notice that plaintiff's TRO had been "moved to Middlesex" and a new docket number was assigned, he did not submit the notice on appeal.

judgment motion in Middlesex County before the same court. We discern no error in the court's consolidation of the TROs and presiding over the parties' trial.

Defendant's next argument that the court erred in granting plaintiff an FRO and "deprived . . . [him] of a fair hearing" is belied by the record. The court's finding that plaintiff established the first prong of Silver, because she established by a preponderance of the evidence that defendant committed harassment under N.J.S.A. 2C:33-4(b) and (c), is amply supported by substantial credible evidence in the record. The court observed that on January 22, 2024, "there was a confrontation . . . [defendant] grabbed [plaintiff's] phone and shoved her." The court reasoned that harassment "is also subjecting another to . . . shoving or other offensive touching or threatening to do so." Further, the court also found defendant's actions constituted "[a]larming conduct." Additionally, the court's determination under prong two of Silver that plaintiff satisfied the need for protection from future acts of violence is sufficiently supported. The court found plaintiff credibly testified about her fear of defendant's future domestic violence based on his predicate act of harassment and prior history, and it believed that "[plaintiff] has every right to feel afraid." Thus, we conclude that there was sufficient credible evidence supporting the

17

trial court's issuance of the FRO.

We also reject defendant's contention that "the court unilaterally modified the custody agreement without allowing . . . [defendant] to present his evidence or arguments." A review of the record demonstrates that defendant's contention is without merit. The court specifically stated, it was "not going to disturb parenting time, [and] I am not going to disturb custody" because the "custody and parenting time arrangements set forth in the [parties matrimonial] case will remain undisturbed." While the court expressed serious concerns about the twins' welfare based on defendant's conduct, the record and FRO contradict defendant's assertion that the court "issued orders without providing proper notice or an opportunity to be heard." The court's FRO entered in favor of plaintiff provided that the parties' custody and parenting time arrangement should continue pursuant to their existing post-matrimonial order. After the court expressed concerns over defendant's harassment and prior behavior in front of the twins, particularly that defendant's actions would have "future long term effects," it determined that their parenting time and custody issues would be best addressed in their pending, upcoming post-judgment motion.

Defendant's contention that the court "denied access" to critical evidence is also unsupported. Specifically, defendant maintains that the Cranford Police

Department refused to provide him with "unredacted police reports and body-worn camera footage essential to his defense." He concedes that this issue was not raised before the trial court. We generally decline to consider questions or issues not presented below when an opportunity for such a presentation is available unless the questions raised on appeal concern jurisdiction or matters of great public interest. See N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 186 (App. Div. 2005) (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). We, therefore, conclude defendant's argument is procedurally defective and not properly before us.

## B. Attorney's Fees

In turning to consider defendant's contentions regarding the court's award of attorney's fees, we begin by acknowledging that "[w]e review the trial court's award of fees and costs in accordance with a deferential standard." Hansen v. Rite Aid Corp., 253 N.J. 191, 211 (2023). "Such an award 'will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion.'" Ibid. (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). Only when a court's fee determination "was based on irrelevant or inappropriate factors, or amounts to a clear error in judgment," should the reviewing court

A-0063-24

intervene.  Ibid. (quoting Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 155-56 (App. Div. 2016)).

Rule 4:42-9(a)(8) permits attorney's fees "[i]n all cases where attorney's fees are permitted by statute."  The PDVA authorizes an award of "reasonable attorney's fees."  N.J.S.A. 2C:25-29(b)(4).  The PDVA provides for attorney's fees "to avoid a chilling effect on the willingness of domestic violence victims to come forward with their complaints."  M.W. v. R.L., 286 N.J. Super. 408, 411 (App. Div. 1995).  If, after considering the factors in Rule 4:42-9(b) and RPC 1.5(a)(1) to (8), the "court finds that the domestic violence victim's attorney's fees are reasonable, and they are incurred as a direct result of domestic violence, then a court, in an exercise of its discretion, may award those fees."  McGowan, 391 N.J. Super. at 508.

Because fees and costs in a domestic violence action are awarded as damages, they are "not subject to the traditional analysis" for an award of fees in family-type claims pursuant to N.J.S.A. 2A:34-23, and the court is not obliged to consider the parties' financial circumstances.  Id. at 507 (quoting Schmidt v. Schmidt, 262 N.J. Super. 451, 454 (Ch. Div. 1992)).  Rather, under the PDVA, attorney's fees may be awarded as compensatory damages if the fees are:  (1) "a direct result of the domestic violence"; (2) reasonable; and (3) presented via

A-0063-24

affidavit pursuant to Rule 4:42-9(b). McGowan, 391 N.J. Super. at 507 (quoting Schmidt, 262 N.J. Super. at 454).

The court is not required to hold an attorney's fee award hearing under our "Court Rules, which merely require submission of an affidavit of service," or case law. Elizabeth Bd. of Educ. v. N.J. Transit Corp., 342 N.J. Super. 262, 271 (App. Div. 2001). "The minimum requirements of due process of law are notice and an opportunity to be heard." Big Smoke LLC v. Township of West Milford, 478 N.J. Super. 203, 227 (App. Div. 2024) (quoting Klier v. Sordoni Skanska Constr. Co., 337 N.J. Super. 76, 84 (App. Div. 2001)). "The opportunity to be heard contemplated by the concept of due process means an opportunity to be heard at a meaningful time and in a meaningful manner." Ibid. (quoting Klier, 337 N.J. Super. at 84).

We reject defendant's contention that the court erroneously awarded attorney's fees and denied him due process. At the conclusion of the trial, where defendant was present and represented by counsel, plaintiff's attorney requested attorney's fees. Relevantly, defendant's counsel agreed to the court's fee application filing deadlines memorialized in the April 19 amended FRO. After plaintiff's attorney submitted her affidavit of services in support of plaintiff's fee

application, defendant's attorney submitted opposition. Despite defendant's contention, he clearly had ample opportunity to contest the fee award.

Moreover, defendant does not claim the court's ordered attorney's fees were not the direct result of his domestic violence, unreasonable, or unsupported by an affidavit. In accordance with RPC 1.5(a) factors, the court's decision made sufficient findings of fact and conclusions of law to support awarding plaintiff's attorney's fees that she reasonably incurred because of defendant's domestic violence. We note the court was well familiar with the record and the attorneys' representation of the parties, having presided over the trial. The court's findings included that plaintiff's attorney's fees were commensurate with similar Family Part proceedings after reviewing each billing entry. Therefore, we see no reason to disturb the court's reasonableness findings.

To the extent not addressed, defendant's remaining contentions lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

22